# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| METZLER ASSET MANAGEMENT GMBH AND ERSTE-SPARINVEST KAPITALANLAGEGESELLSCHAFT mbH, on behalf of Themselves and all other similarly situated parties,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>STUART "TONY" A. KINGSLEY, GEORGE A. SCANGOS, PAUL C. CLANCY, and BIOGEN INC.,<br><br>   *Defendants*. | Case No. 16-12101-FDS<br><br><br>Jury Trial Demanded |

## AMENDED CLASS ACTION COMPLAINT

### MOTLEY RICE LLC

Gregg S. Levin (BBO # 563771)
Christopher F. Moriarty (*pro hac vice* pending)
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
E-mails: glevin@motleyrice.com
    cmoriarty@motleyrice.com

William H. Narwold (*pro hac vice*)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  (860) 882-1676
Facsimile:  (860) 882-1682
E-mail:  bnarwold@motleyrice.com

*Lead Counsel for Plaintiffs Metzler Asset Management GmbH,*
*Erste-Sparinvest Kapitalanlagegesellschaft mbH, and the Proposed Class*

### LABATON SUCHAROW LLP

Jonathan Gardner (*pro hac vice*)
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Email:  jgardner@labaton.com

*Additional Counsel for Plaintiffs*
*Metzler Asset Management GmbH, Erste-*
*Sparinvest Kapitalanlagegesellschaft mbH,*
*and the Proposed Class*

### ROBBINS GELLER RUDMAN& DOWD LLP

Samuel H. Rudman (*pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:  (631) 367-1173
Email:  srudman@rgrdlaw.com

*Additional Counsel for Plaintiffs*
*Metzler Asset Management GmbH, Erste-*
*Sparinvest Kapitalanlagegesellschaft mbH,*
*and the Proposed Class*

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................................ 2

II.  JURISDICTION AND VENUE ........................................................................................... 12

III. PARTIES ......................................................................................................................... 12

IV.  CONTROL PERSON ALLEGATIONS ............................................................................... 14

V.   SUBSTANTIVE ALLEGATIONS ...................................................................................... 16

   A.   The Company and its Business .......................................................................... 16

   B.   Defendants Were Aware of the Risk Posed by PML ........................................... 19

   C.   Biogen Knew That Tecfidera's Safety Profile Dropped Drastically in 2014 ....... 20

   D.   Defendants Announce the First Tecfidera Patient Death from PML but
        Reaffirm Confidence in Tecfidera ..................................................................... 24

   E.   The PML Incident Materially Impacts Tecfidera Sales ...................................... 26

   F.   Defendants Track Tecfidera Sales and Reduced Sales Compensation Goals
        in Light of Decreased Sales .............................................................................. 40

   G.   Defendants Downplay Any Negative Impact on Tecfidera Performance ........... 42

   H.   Defendants Partially Disclose the PML Incident's True Impact on
        Tecfidera Performance ...................................................................................... 45

   I.   Defendants Continue to Downplay The True Extent of the Negative
        Impact on Tecfidera .......................................................................................... 46

   J.   The Whole Truth is Revealed – Biogen Cuts Previously Confirmed
        Guidance in Half ............................................................................................... 47

   K.   Post-Class Period Events ................................................................................... 48

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
     OMISSIONS .................................................................................................................. 49

   A.   July 23, 2014 2Q 2014 Biogen Inc. Earnings Call ............................................ 49

   B.   July 23, 2014 2Q Press Release ........................................................................ 50

   C.   September 11, 2014 Press Release...................................................................... 51

   D.   October 22, 2014 3Q 2014 Biogen Inc. Earnings Call and Partial
        Disclosure of the Truth ...................................................................................... 51

   E.   December 2, 2014 Deutsche Bank BioFEST Conference Call............................ 56

   F.   January 12, 2015 J.P. Morgan Healthcare Conference ....................................... 57

   G.   January 29, 2015 4Q 2014 Biogen Inc. Earnings Call........................................ 58

   H.   February 25, 201 RBC Healthcare Conference .................................................. 65

   I.   April 24, 2015 1Q 2015 Biogen Inc. Earnings Call and Partial Disclosure
        of the Truth ....................................................................................................... 67

     J.     May 6, 2015 Deutsche Bank Health Care Conference ......................................... 70

     K.    May 13, 2015 Bank of America Merrill Lynch Healthcare Conference Call....... 71

     L.     May 27, 2015 Sanford C. Bernstein Strategic Decisions Conference .................. 73

VII.   THE WHOLE TRUTH IS REVEALED .................................................................................... 74

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ................................................................................ 77

     A.    That the Individual Defendants Made Numerous Specific Statements
           Regarding Tecfidera Sales Is Directly Relevant to the Scienter Analysis............ 77

     B.    Tecfidera Sales Were Biogen's Principal Source of Revenue, Triggering a
           "Core Operations" Inference................................................................................. 78

     C.    Scienter May Be Inferred from the Fact that Biogen's Product
           Development and Related Operations Are Highly Regulated ............................. 80

     D.    The Disparity Between the Individual Defendants' Words and the Actual
           State of Affairs Is Indicative of Scienter............................................................. 81

     E.    Post-Class Period Developments Support a Strong Inference of Scienter .......... 82

IX.    CLASS ACTION ALLEGATIONS ........................................................................................... 84

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE*
     DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET
     DOCTRINE ....................................................................................................................... 85

XI.    NO SAFE HARBOR ........................................................................................................... 88

XII.   LOSS CAUSATION/ECONOMIC LOSS .................................................................................. 89

     Count I:   Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b)
           Promulgated Thereunder Against All Defendants............................................... 90

     Count II:   Violation of Section 20(a) of The Exchange Act Against the Individual
           Defendants .......................................................................................................... 93

JURY TRIAL DEMANDED ........................................................................................................... 95

Lead Plaintiff Metzler Asset Management GmbH and Lead Plaintiff Erste-Sparinvest Kapitalanlagegesellschaft mbH (together, "Lead Plaintiff"), by its undersigned attorneys, bring this securities fraud class action against defendants Stuart A. Kingsley ("Kingsley"), George A. Scangos ("Scangos"), Paul J. Clancy ("Clancy," and together with Kingsley and Scagnos, the "Individual Defendants"), and Biogen Inc. ("Biogen" or the "Company," and together with the Individual Defendants, "Defendants").  The allegations in this Amended Class Action Complaint ("Amended Complaint") are based on Lead Plaintiff's personal knowledge as to its own acts, and based upon information and belief as to all other matters.  Lead Plaintiff's allegations are also based upon counsel's investigation into Defendants' fraudulent conduct, which included: (1) numerous interviews with former employees of Biogen and other persons with knowledge of the matters alleged, some of whom provided information in confidence (these confidential witnesses ("CWs") are identified in the Amended Complaint by number); (2) an interview with Dr. Ben Thrower, the Medical Director of the MS Institute at Shepherd Center in Atlanta, Georgia (the "Shepherd Center"); (3) an interview with Dr. Scott Zamvil, a neurologist at The University of California, San Francisco Medical Center ("UCSF Medical Center") who specializes in MS treatment; (4) a review of internal Biogen documents provided by several CWs; and (5) a review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings made by Biogen, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company, media reports about the Company, and consultations with experts.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Lead Plaintiff specifically alleges as follows on behalf of itself and the class it seeks to represent:

# I.    NATURE OF THE ACTION

1.      This action is brought on behalf of a Class consisting of all purchasers of Biogen's publicly traded securities during the period from July 23, 2014 through July 23, 2015, inclusive (the "Class Period"), and who were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Biogen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.  Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act").

2.      Biogen is a biopharmaceutical company that develops therapies for neurological, autoimmune, and hematologic disorders.  In 2006, Biogen acquired Fumapharm AG (a privately held pharmaceutical company formerly headquartered in Switzerland) and the rights to Tecfidera (also known as *dimethyl fumarate*), an oral (versus injectable) drug for the treatment of certain forms of multiple sclerosis ("MS").  Tecfidera, an immunosuppressant that is prescribed to treat MS, was approved by the Food & Drug Administration ("FDA") in March 2013 and the European Commission ("EC") in February 2014.

3.      Tecfidera was the main driver of Biogen's revenues and profits during the Class Period, comprising between 32% and 34% of the Company's total revenue in Q4 2014, Q1 2015, and Q2 2015.  In Q3 2014, Tecfidera revenue was approximately $787 million, or more than 31% of the Company's total revenue.  Biogen emphasized the importance of Tecfidera in its October 22, 2014 Form 10-Q, stating that its "current revenues depend upon continued sales of our principal products" including Tecfidera, and that Biogen "may be substantially dependent on

sales from our principal products for many years, including an increasing reliance on sales of Tecfidera as we expand into additional markets."

4.      Beginning in the spring of 2014, the Shepherd Center, a leading prescriber of Tecfidera in the United States among MS centers, began conducting blood tests of MS patients taking Tecfidera to monitor for possible side effects.  As a result of these tests, the Shepherd Center started observing that there was an elevated risk of patients developing low lymphocyte counts among patients on Tecfidera.  Lymphocytes are a subtype of white blood cells, and low lymphocyte counts compromised those patients' immune systems.  By way of comparison, some of the Shepherd Center's patients with lowered lymphocyte counts appeared to have laboratory values similar to those of a person suffering from Acquired Immunodeficiency Syndrome ("AIDS").

5.      By August 1, 2014, Doctor Ben Thrower—the medical director of the Shepherd Center and a leading doctor in the MS community—began notifying Biogen that Tecfidera was causing low lymphocyte counts among approximately 30% of the Shepherd Center's MS patients taking the drug.  Dr. Thrower informed Biogen of the Shepherd Center's conclusion that Tecfidera was not as safe as Biogen had been communicating publicly.  Dr. Thrower expressed the Shepherd Center's concerns during in-person meetings in August and September 2014 with Keith Ferguson, Biogen's Senior Sales Director, as well as Eric Hall, Biogen's Medical Science Liaison.  Dr. Thrower was no stranger to Biogen:  from 2010 to 2013, he was one of the doctors involved in the ENDORSE clinical trial that the Company conducted for Tecfidera before the FDA approved the drug for sale in the United States.

6.      Upon determining in approximately August 2014 that Tecfidera compromised patients' immune systems, the Shepherd Center completely stopped prescribing Tecfidera for

new MS patients.  Furthermore, the Shepherd Center discontinued at least half of its 400 patients taking Tecfidera off the drug, transferring them onto other therapies.  This was made known to the Company by the Shepherd Center through its contacts at Biogen, including Biogen's Senior Sales Director, Medical Science Liaison, and Area Business Manager ("ABM").

7.     An internal Biogen document confirms that Biogen was aware that the Shepherd Center began removing patients from Tecfidera and, as a result, the number of new starts and referrals (i.e., new prescriptions of Tecfidera) "plummeted."  The internal document also indicates that Dr. Thrower's decision to discontinue patients off Tecfidera "began a domino effect in the territory which caused [other] neurologist[s] to also change their prescribing patterns away from Tecfidera."

8.     Dr. Scott Zamvil, a neurologist at UCSF Medical Center who specializes in the treatment of MS, independently confirmed that his colleagues at the Shepherd Center informed Biogen in the summer of 2014 that their patients were experiencing significant declines in lymphocyte counts while taking Tecfidera.  Dr. Zamvil specifically recalled that Dr. Guy Buckle of the Shepherd Center told him during a conference in March 2015 that the Shepherd Center notified Biogen in the summer of 2014 about declining lymphocyte counts in its patients taking Tecfidera, and that the Shepherd Center provided Biogen with both the case file and lab results.

9.     Despite this evidence, Biogen did not publicly disclose any of these disturbing developments.  Rather, throughout the second and third quarters of 2014, Biogen publicly affirmed Tecfidera's safety profile and growing sales, and omitted any mention of the fact that the number one source of Tecfidera prescriptions in the United States, the Shepherd Center, completely stopped prescribing Tecfidera and took at least half of its existing patients off of the drug in light of its dangerous side effects.

4

10.    On October 22, 2014, however, Biogen was forced to partially disclose the true nature of Tecfidera's safety profile when the Company announced that an MS patient who had taken Tecfidera for four-and-a-half years as part of the ENDORSE clinical study died of progressive multifocal leukoencephalopathy ("PML").   PML is a rare and serious brain infection caused by a virus that is dangerous for individuals with a weakened immune system.  This was the first time that Tecfidera, which works by suppressing the immune system, had been publicly associated with PML.   The PML death was caused by the exact same side effects—a weakened immune system—that Biogen was made aware of *months earlier* during the second and third quarter of 2014 by the Shepherd Center, which at the time was the leading prescriber of Tecfidera among MS centers in the United States.   According to Dr. Zamvil, lymphocytopenia precedes PML.   He added that most physicians know that any indication of lymphocytopenia would indicate a very significant concern of subsequent PML.

11.    Biogen's executives knew that a PML death associated with Tecfidera was likely. According to a CW who provided information in support of Lead Plaintiff's allegations, Biogen's medical team was instructed to come up with a planned response to a PML-linked death for Tecfidera beginning in 2013.   Moreover, this planned response was approved at the highest levels of the Company.

12.    Perhaps consistent with its plan, Biogen announced the PML death on October 22, 2014, partially disclosing that Tecfidera's safety profile was materially different than what Defendants had led the market to believe.   However, Defendants repeatedly and misleadingly reassured the market that the overall risk and safety profile of Tecfidera was unchanged, that doctors were continuing to prescribe it in increased numbers, that the number of patients categorized as "new starts" on the drug continued to indicate sustained growth momentum, that

doctors were not taking patients off of Tecfidera, and that Tecfidera would continue to drive strong revenue growth for the Company.  In fact, on the very same day they disclosed the PML death, Defendants assured investors that "there is meaningful, still meaningful growth in Tecfidera in the United States, as we continue to penetrate doc[tor]s and penetrate the marketplace," and that they were "very comfortable with the trajectory of the product right now."

13.     On November 25, 2014, one month after the PML death, the FDA issued a warning and indicated that Biogen would update the Tecfidera label to include information regarding the PML death.  The FDA recommended that physicians monitor patients on Tecfidera and "urge[d] health care professionals and patients to report side effects involving Tecfidera to the FDA MedWatch program."

14.     Notwithstanding the label change, Defendants continued to express confidence in Tecfidera and its ability to drive revenue growth for Biogen.  On December 2, 2014, Defendants claimed that the market for MS treatments was "moving to [oral medications] and the indicators that we have is [sic] that Tecfidera is unquestionably the leading oral [drug]."  Defendants further stated that Tecfidera's discontinuation rates (i.e., the rate at which patients were taken off the drug) were "very consistent," even though the Company hoped to "get better performance in the discontinuation rates over a longer period of time."

15.     Similarly, in January 2015, Defendants stated that "Tecfidera will continue to be a *major business driver* as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world," and provided full year 2015 guidance of 14-16% revenue growth.  Defendants further stated that the guidance was based on "Tecfidera . . . represent[ing] the largest contributor to our overall revenue growth."

16.     Defendants assured the market that they were working to educate doctors about the label change, and provided no indication that the PML death was materially impacting Tecfidera revenues beyond a minor effect on growth pace.  Defendants stated that "the lack of any meaningful change that we see . . . in the discon[tinuation] rate [of Tecfidera among patients] is encouraging, because it doesn't suggest that there's a change in the profile that people are anxious to pull patients out, but on the contrary."

17.     In February 2015, Dr. Zamvil concluded his own study that showed Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.  Dr. Zamvil suggested that, in addition to Shepherd Center and himself, numerous other doctors saw similar lymphocyte count declines and lymphocytopenia in their patients.  Moreover, after the PML death and the completion of his study in early 2015, Dr. Zamvil explained that he was reluctant to put any new patients on Tecfidera and took patients off of the drug who were showing any signs of lymphocytopenia.

18.     During a February 25, 2015 analyst discussion, however, Defendants stated that they were "very comfortable with where Tecfidera is in terms of patient capture."  Regarding the impact of the PML incident on physicians' perception of safety, they also stated that Tecfidera "has been quite resilient."  On March 2, 2015, Defendants reiterated that Tecfidera was Biogen's "main driver here continuing to grow, continuing to do well" for the Company's market share in MS treatment."

19.     During an April 24, 2015 earnings call, Defendants partially disclosed that the PML death actually was having an impact on Tecfidera sales, stating that while Tecfidera "continued to add patients," it was "at an overall slower rate."  However, Defendants misleadingly downplayed the impact of the PML incident on Tecfidera performance, stating that

"our internal market research suggests that physician intent to prescribe may be improving [and w]e believe these data indicate that we are assisting physicians in putting the updated label into context."  Defendants made no change to Biogen's January guidance range for revenue growth, stating that Tecfidera continued to be "the largest contributor to overall revenue growth," with the long-term outlook for Tecfidera remaining "strong."

20.    Defendants further stated that there was only "*little* unfavorable impact on the safety perceptions" from the PML incident, that it had already "stabilized," and that the Company was focused on turning it around.  When asked how long the complete turnaround would take, Defendants asserted that they had been educating physicians since November 2014, and that they "fundamentally believe that we . . . still have upward trajectory on Tecfidera from a share perspective, from a patient perspective, no doubt about it."

21.    Defendants continued to tout Tecfidera's favorable safety profile of Tecfidera in the spring of 2015.  On April 24, 2015, for example, Defendants asserted there was "no real change in the benefit-risk profile of the drug for patients with MS."  Similarly, Defendants portrayed any fallout from the PML death as contained, stating that "physicians have kind of digested the information, taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event."  According to Defendants, Biogen "continue[d] to see [its] share of capturing of new scripts and switched scripts higher than [its] share.  That's usually an indication that we'll get upward momentum in the business."  Defendants also represented that the PML death had not "change[d] the benefit risk profile for [Tecfidera] in any way" and emphasized "the great safety profile of Tecfidera" in conversations with physicians.

22.     In sum, at no time during the Class Period did Defendants provide any indication to the market that the PML death, or the underlying cause of the PML death, had materially impacted Tecfidera sales, or caused physicians to stop prescribing Tecfidera and switch patients onto other therapies in light of safety concerns with the drug.  Analysts accepted the Company's narrative about Tecfidera throughout the entirety of the Class Period.

23.     However, Defendants' public statements about both Tecfidera's safety profile and the effect of the PML death on Tecfidera's financial performance during the Class Period did not reflect material facts that were known to them.   In stark contrast to Defendants' public statements, two major medical centers and prescribers of Tecfidera—the Shepherd Center and the University of Pennsylvania in Philadelphia—stopped prescribing Tecfidera after the PML death because of the safety concerns, and took hundreds of existing patients off of the drug during the Class Period.  Furthermore, physicians at both institutions lost confidence in the safety profile of Tecfidera as a result of what Biogen itself termed a "safety event."  Defendants knew, or were reckless in not knowing, about these impacts because the Shepherd Center was the top source of Tecfidera prescriptions among MS centers in the United States early in the Class Period.  Dr. Thrower confirmed that Biogen was advised that the discontinuations and halts in new starts of patients on Tecfidera were the direct result of increased risk of lowered lymphocyte counts which caused the PML death.

24.     In addition, former Biogen employees confirmed that Tecfidera sales dropped steeply after the October 2014 announcement of the PML death and that there was a "big slowdown" Company-wide in Tecfidera market expansion by November 2014.  Dr. Zamvil and numerous former Biogen employees from around the country also confirmed that doctors stopped prescribing Tecfidera and were actively discontinuing patients off of the drug following

the PML death because of safety concerns, which directly contradicted Defendants' public statements.

25.     Further, there is significant evidence that:  (1) the declining sales and increasing discontinuation rate of Biogen's leading drug product was regularly reported to Biogen's executives; and (2) those executives responded internally to it.  For example, at a Biogen Town Hall meeting in November 2014, Scangos told employees that the overall sense of the trajectory was changing and employees were warned of pending organizational changes in 2015 because of, among other things, the expected impact on performance caused by the PML death.

26.     Former employees also confirmed that Biogen adjusted the goals for Tecfidera sales personnel downwards in late 2014 and early 2015 in order to make compensation goals easier to attain.  Yet many salespersons still failed to meet these lowered goals.  According to an internal Biogen document, the reduction in sales compensation goals for the second quarter of 2015 was 15% across all territories and regions.  Sales goals for Tecfidera in the Philadelphia area alone were cut by more than 50%.  According to former employees, Biogen held a sales meeting in Texas in March 2015 where the PML death was described as a "market event" that was negatively impacting Tecfidera sales.

27.     A mere two months after reassuring investors in late May 2015 that physicians' perception of Tecfidera's safety had "stabilized" back to where it was before the PML death, and just three months after failing to revise guidance, Defendants disclosed to the market the truth about the impact of the PML death on Tecfidera's performance and safety profile.  On July 24, 2015, before the market opened, the Company announced that it was cutting its revenue guidance in half, "based largely on revised expectations for the growth of Tecfidera."

28.     In particular, the Company disclosed that "[d]uring 2015, Tecfidera's U.S. patient growth versus prior quarters has moderated primarily due to changing physician prescribing patterns and intense competition."  On an earnings call later the same day, Scangos stated that the expected "reacceleration of Tecfidera this quarter . . . did not happen to any appreciable extent," and Kingsley acknowledged that "we saw moderated patient growth for our MS portfolio as a whole this quarter . . . . *We believe the safety event reported in late 2014* has created greater caution on the part of both physicians and patients about switching to orals." Clancy also admitted that the "substantial decrease from our prior guidance" to "between 6% and 8%" revenue growth was "primarily driven by a change in our estimate for Tecfidera's trajectory.  Our balance of year forecast assumes *limited patient growth for Tecfidera* in the United States."

29.     On this news, Biogen's common stock plummeted from $385.05 per share at the close of the market on July 23, 2015 to $300.03 per share at the close of the market on July 24, 2015, a decline of more than 22% in a single day on unusually heavy trading volume of 16,611,700 shares, compared with an average daily trading volume over the Class Period of approximately 1,629,730 shares.

30.     On July 27, 2015, a J.P. Morgan analyst report stated that "management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box. . . . The messy 1Q report was supposed to be a one-time anomaly.  Instead, 2Q results and revised guidance seem to indicate the problem is much more systemic.  It's no wonder that investor confidence is shaken."  Similarly, a Morgan Stanley analyst report issued the same day stated that "[Biogen management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

11

31.     Shortly after disclosing the whole truth about Tecfidera, on October 9, 2015 Biogen announced that Kingsley, who was responsible for Global Commercial Operations, would "leave the company and a search has been initiated for a permanent replacement."

## II.     JURISDICTION AND VENUE

32.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

34.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Biogen is headquartered in this District and during the Class Period each of the Individual Defendants worked for Biogen in this District.

35.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

36.     Lead Plaintiff Metzler Asset Management GmbH ("Metzler") is a German capital investment company headquartered in Frankfurt am Main, Germany.   Metzler controls and manages public and specialty investment funds.   As set forth in the certification previously submitted (*see* ECF No. 14-2), Metzler's funds purchased Biogen securities at artificially inflated prices and suffered damages as a result of the securities law violations alleged herein.

37.     Lead Plaintiff Erste-Sparinvest Kapitalanlagegesellschaft mbH ("Erste-Sparinvest") is an investment company based in Vienna, Austria.   As part of Erste-Sparinvest's

asset management services, it is responsible for managing mutual funds, private funds, and institutional funds. As set forth in the certification previously submitted (*see* ECF No. 14-2), Erste-Sparinvest's funds purchased Biogen securities at artificially inflated prices and suffered damages as a result of the securities law violations alleged herein.

38. Defendant Biogen is a global biotechnology company that markets drugs for MS and other autoimmune disorders. Biogen was formed as a California corporation in 1985 as IDEC Pharmaceutical Corporation ("IDEC"), and became a Delaware corporation in 1997. In 2003, IDEC acquired Biogen Inc. and changed its name to Biogen Idec Inc. In March 2015, the Company changed its name to Biogen Inc. Biogen is headquartered in Cambridge, Massachusetts and as of December 31, 2014, the Company had approximately 7,550 employees worldwide. Biogen's securities, at all times relevant here, traded on the NASDAQ under the ticker symbol "BIIB."

39. Defendant Scangos was at all relevant times Biogen's Chief Executive Officer and a member of the Company's Board of Directors. Scangos was a direct and substantial participant in the fraud. In July 2016, Biogen announced that Scangos would leave the Company (which he did in January 2017).

40. Defendant Clancy is, and was at all relevant times, Biogen's Executive Vice President, Finance and Chief Financial Officer. Clancy was a direct and substantial participant in the fraud.

41. Defendant Kingsley was at all relevant times Biogen's Executive Vice President, Global Commercial Operations. Kingsley held this position from November 2011 to October 2015. Kingsley was responsible for overseeing Biogen's sales force and commercial operations.

Kingsley was a direct and substantial participant in the fraud.  Kingsley left Biogen shortly after the truth was fully revealed regarding the Defendants' fraud.

## IV.   CONTROL PERSON ALLEGATIONS

42.     The Individual Defendants, because of their positions of control and authority as senior executive officers (and as a Director for Scangos), had access to the adverse, undisclosed information about Biogen's business and the PML incident's negative impact on Tecfidera's safety profile and financial performance through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees, and reports and other information provided to them.

43.     The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of; were aware of, or recklessly disregarded, the material misstatements and omissions at issue; and were aware of their materially false and misleading nature.  Kingsley led the introduction and launch of Tecfidera and supervised Biogen's sales force.  Tecfidera was the Company's main revenue source during the Class Period.  Accordingly, Tecfidera's revenue and sales growth were crucial to the Company's success.  The Individual Defendants followed, tracked, and were aware of Tecfidera's financial performance, or should have followed, tracked and been aware of it, at all relevant times.

44.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were

provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

45.     As senior officers and controlling persons of a publicly held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.   The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

46.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Biogen's securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding Tecfidera sales, safety profile, and revenue, as well as their impact on Biogen's total revenues and revenue guidance during the Class Period.   The scheme: (i) deceived the investing public regarding Biogen's operations and business, specifically the PML incident's material impact on Tecfidera's safety profile and financial performance, and the true value of Biogen's securities; and (ii) caused Metzler's funds, Erste-Sparinvest's funds, and

other members of the Class to purchase Biogen's securities at artificially inflated prices, which fell as the truth about Tecfidera was disclosed.

47.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Biogen, were acting on behalf of the Company in the regular course of business.   Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      The Company and its Business

48.     Biogen is a global biopharmaceutical company that develops and markets treatments for certain neurological, autoimmune, and hematological diseases.   Tecfidera, one of four principal MS drugs the Company markets, is an oral therapy approved for use in the United States and the European Union to treat certain forms of MS.   It was approved by the FDA in March 2013 and the EC in February 2014.   Sales in the United States began in mid-2013.   In 2015, the wholesale cost of Tecfidera per patient was approximately $70,000.   As such, each lost sale represented a significant impact on Tecfidera revenue.   As shown below, from the time it launched, Tecfidera was a significant source of revenue for Biogen:

|         | Tecfidera Revenue | Total Revenue | Tecfidera Revenue as % of Total Revenue |
|---------|-------------------|---------------|-----------------------------------------|
| Q2 2013 | $192,100,000      | $1,723,473,000 | 11.15% |
| Q3 2013 | $286,400,000      | $1,827,780,000 | 15.67% |
| Q4 2013 | $398,000,000      | $1,965,850,000 | 20.25% |
| Q1 2014 | $505,700,000      | $2,129,751,000 | 23.74% |
| Q2 2014 | $700,400,000      | $2,421,452,000 | 28.92% |
| Q3 2014 | $787,100,000      | $2,511,446,000 | 31.34% |
| Q4 2014 | $916,000,000      | $2,640,675,000 | 34.69% |
| Q1 2015 | $824,900,000      | $2,554,963,000 | 32.29% |
| Q2 2015 | $883,300,000      | $2,591,642,000 | 34.08% |
| Total   | **$5,493,900,000** | **$20,367,032,000** | 26.97% |

49.     Throughout the Class Period, Tecfidera was Biogen's leading revenue source, accounting for more than 30% of the Company's total revenue.

50.     In its October 22, 2014 Form 10-Q for 2Q 2014, Biogen emphasized the importance of Tecfidera, stating:

> Our current revenues depend upon continued sales of our principal products, AVONEX, TECFIDERA, TYSABRI, and RITUXAN.  We may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales of [Tecfidera] as we expand into additional markets.

51.     During a January 12, 2015 JPMorgan Healthcare Conference, Scangos stated that Tecfidera was a major business driver for the Company:

> The products that we launched recently will continue to be major drivers and will play an increasingly large part in our pipeline obviously as we go forward.  We believe that [Tecfidera] will continue to be a major business driver as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world.

52.     During the Company's January 29, 2015 earnings call, Clancy emphasized that the Company's revenue guidance was chiefly dependent on Tecfidera: "Our plan assumes [Tecfidera] will represent the largest contributor to our overall revenue growth."

53.     Biogen's February 4, 2015 Form 10-K for the fiscal year ending December 31, 2014 stated that:

> Product sales for AVONEX, TECFIDERA and TYSABRI and unconsolidated joint business revenues for RITUXAN each accounted for more than 10% of our total revenue for the years ended December 31, 2014 and 2013. . . .
>
> . . . .
>
> Our current revenues depend upon continued sales of our principal products, TECFIDERA, AVONEX, TYSABRI, and RITUXAN.  *We may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales and growth of [Tecfidera] as we continue to expand into additional markets.*

54.     During a March 2, 2015 Cowen Healthcare Conference, Scangos referred to Tecfidera as "certainly our main driver" while discussing the Company's growing market share in MS treatment.

55.     Biogen's April 24, 2015 Form 10-Q for 1Q 2015 stated:

> Our current revenues depend upon continued sales of our principal products.  We may be substantially dependent on sales from our principal products for many years, including an increasing reliance on sales of [Tecfidera] as we expand into additional markets.

56.     Analysts also reiterated the importance of Tecfidera to Biogen.  For example, in a January 30, 2015 research note after the Company announced 4Q 2014 earnings, Deutsche Bank stated that "FY14 results were driven by the strength of Tecfidera with 4Q revenues" and that Biogen's "[m]anagement continues to see Tecfidera growing in 2015."  A Stock Report from S&P Capital IQ on May 4, 2015 predicted "revenue growth of 14.4% in 2015 . . . following the 40.0% and 25.7% growth in 2014 and 2013, respectively, driven by . . . Tecfidera."

57.     Biogen's February 4, 2015 Annual Report on Form 10-K and April 24, 2015 Form 10-Q included certifications signed by Scangos and Clancy, required under the Sarbanes-Oxley Act of 2002, representing that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

58.     The February 4, 2015 Form 10-K included management's assessment of internal control over financial reporting:

> Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2014.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in its 2013 Internal Control — Integrated Framework.

Based on our assessment, our management has concluded that, as of December 31, 2014, our internal control over financial reporting is effective based on those criteria.

## B.     Defendants Were Aware of the Risk Posed by PML

59.     When Biogen launched Tecfidera in 2013, Defendants already were aware (1) of the significant risk that a PML death posed to Tecfidera's safety profile and financial success, and (2) that a PML death associated with Tecfidera was likely to occur.

60.     CW15[1] was employed by Biogen in the Company's Cambridge, Massachusetts headquarters from February 2012 to November 2014.   Before leaving Biogen, CW15 was Manager of Medical Research in Global Medical where he was responsible for reviewing investigator-initiated trials requested by Biogen's sales force and key physician opinion leaders. Before that time, he held the following positions at Biogen:  Senior Scientific Writer, Scientific Writer, and Medical Affairs Scientist I.   CW15 reported to Director of Medical Research, Michael Edwards, who reported to Head of Medical Research in Global Medical, Jing Marantz, who reported to Senior Vice President – Head of Worldwide Medical, Amit Rakhit, who reported to Executive Vice President of R&D, Douglas Williams, who reported to Scangos.

61.     According to CW15, soon after Tecfidera was approved and released to the market in 2013, a decision was made by Biogen's Marketing and Communications departments to have a response to a PML-linked death prepared.  CW15 stated that one of his responsibilities as a Senior Scientific Writer (August 2013 – July 2014) was to work on this prepared response for any PML case associated with Tecfidera.  CW15 explained that a Tecfidera-linked PML case was a matter of "when, not if."  Those working on the prepared response to a PML case included members from the marketing, communications, sales, medical, and investor relations

---

[1] All CWs are described in the masculine to protect their identities.

departments.  According to CW15, the response was prepared and only needed the specifics from a PML-linked case to be finalized.

62.      According to CW15, the "G8" was Scangos's term for his senior executive leadership team.  CW15 recalled that the prepared response to a PML case was approved by Scangos's "G8" approximately three months before the first PML-case linked to Tecfidera was reported.

### C.      Biogen Knew That Tecfidera's Safety Profile Dropped Drastically in 2014

63.      Ben W. Thrower, M.D., is the medical director of the Shepherd Center.  The Shepherd Center is a private, not-for-profit hospital.  From 2010 to 2013, Dr. Thrower was one of the doctors involved in the ENDORSE clinical trial that Biogen conducted for Tecfidera.  Dr. Thrower previously served as the medical director of the Holy Family Multiple Sclerosis Institute in Spokane, Washington.  In Spokane, Dr. Thrower was the chair of the Inland Northwest Chapter of the National Multiple Sclerosis Society.  In 2000, Dr. Thrower was awarded the Norm Cohn Hope Chest Award by the National MS Society, recognizing his work with the MS community.  In 2005, Dr. Thrower was the first physician inductee into the Georgia Chapter of the National MS Society Volunteer Hall of Fame.

64.      Dr. Thrower is a clinical instructor of neurology at Emory University and participates actively in clinical research.  Dr. Thrower has served on the board of directors of the Georgia Chapter of the National MS Society and the board for the Consortium of Multiple Sclerosis Institutes.  He is currently a Senior Medical Advisor to the Multiple Sclerosis Foundation.  In September 2015, Dr. Thrower co-authored a book titled *Navigating Life with Multiple Sclerosis*.

65.     By August 1, 2014, the Shepherd Center was the leading prescriber of Tecfidera in the United States among MS centers.  As of that date, approximately 400 of the Shepherd Center's MS patients were taking Tecfidera.  Beginning in the spring of 2014, the Shepherd Center began conducting additional blood tests of MS patients taking Tecfidera to monitor for possible side effects.  As a result of those tests, the Shepherd Center observed that there was an elevated risk of developing low lymphocyte counts among patients on Tecfidera.  As noted above, lymphocytes are a subtype of white blood cells.  Lymphocyte counts in turn compromised those patients' immune systems.  By way of comparison, some of the Shepherd Center's patients with depressed levels of lymphocytes appeared to have laboratory values similar to those of a person suffering from AIDS.

66.     In approximately August 2014, Dr. Thrower began notifying Biogen that Tecfidera was causing this impact in approximately 30% of the Shepherd Center's MS patients who were taking Tecfidera.  Dr. Thrower expressed the Shepherd Center's conclusion that Tecfidera was not as safe as Biogen had been stating publicly.  Dr. Thrower expressed the Shepherd Center's findings regarding Tecfidera during in-person meetings with Keith Ferguson, Biogen's Senior Sales Director, as well as Biogen's Medical Science Liaison, Eric Hall, in August and September 2014.

67.     Upon determining that Tecfidera compromised patients' immune systems, the Shepherd Center completely stopped prescribing Tecfidera for MS patients.  Furthermore, the Shepherd Center discontinued at least half of the 400 patients taking Tecfidera, taking them off of the drug and transferring them to other therapies such as Teva Pharmaceutical's injectable drug, Copaxone.  The Shepherd Center's contacts at Biogen, including Keith Ferguson, Eric Hall, and Todd Burks, were aware of this development at the time because the Shepherd Center

informed them that it was no longer prescribing Tecfidera for new patients and discontinuing existing patients.

68.     CW12 was an ABM at Biogen from March 2009 to July 2015 and worked in the Atlanta area.[2]  An internal Biogen document provided by CW12, the 2014 Year-End Review for CW12 written in February 2015, confirms that Biogen was aware of the developments at the Shepherd Center.  In CW12's 2014 Year-End Review, Biogen Regional Director Craig Brown ("Brown") wrote that CW12's performance took a negative "due to a non-commercial event which impacted your number one MS volume and influencer account, . . . Shepherd Center." Brown wrote contemporaneously that:

> The MS center medical director, Dr. Ben Thrower, and his partners began *removing patients from Tecfidera, and the number of new starts and referrals subsequently plummeted*.  Dr. Thrower's actions *began a domino effect in the territory* which caused some of your community based neurologist[s] to also *change their prescribing patterns away from Tecfidera*.  At the conclusion of Q3, you fell short of your Tecfidera new patient start goal . . . .

(Emphases added.)

69.     Dr. Scott Zamvil is a prominent neurologist at UCSF Medical Center who specializes in MS treatment.  He was named a Harry Weaver Neuroscience Scholar by the National Multiple Sclerosis Society in 1994 for his work in the MS field.  Dr. Zamvil has conducted extensive research and published studies about MS and MS treatments.  He has received funding for his research from the National Multiple Sclerosis Society, National Institutes of Health, Wadsworth Foundation, and the Maisin Foundation.

70.     Dr. Zamvil confirmed that his colleagues at the Shepherd Center informed Biogen in the summer of 2014 that their patients were experiencing significant declines in their

---

[2] According to Biogen, an ABM is a "specialty sales representative position [that is] called upon to sell our Neurology products with key stakeholders in the Multiple Sclerosis community: including Neurologists, allied health professionals, and local MS chapters."

lymphocyte counts while taking Tecfidera.   Specifically, Dr. Zamvil recalled that Dr. Guy Buckle of the Shepherd Center told him during a conference in March 2015 that the Shepherd Center notified Biogen about declining lymphocyte counts in its patients taking Tecfidera, and that the Shepherd Center provided Biogen with both the case file and lab results.   Dr. Zamvil recalled that the Shepherd Center was monitoring roughly 300 patients when they informed Biogen of their findings.   He explained that lymphocytopenia precedes PML and most physicians know that any indication of lymphocytopenia would indicate a significant concern about PML.

71.     According to Dr. Zamvil, he was one of the many doctors that went through "Biogen brainwashing" regarding Tecfidera's safety profile prior to the launch of the drug. Dr. Zamvil explained that, as Tecfidera's launch approached in 2012 and 2013, he questioned Tecfidera's efficacy, but ultimately prescribed Tecfidera over other oral medications because he hoped (and Biogen led him to believe) that its safety profile was better.   Dr. Zamvil said that after Tecfidera launched in the spring of 2013, he was "putting patients on left and right."   But, while Biogen promoted Tecfidera as the "safest" option, according to Dr. Zamvil, it turned out to be the most dangerous.

72.     In February 2015, Dr. Zamvil completed his own study that showed that Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.   Dr. Zamvil also recalled that in addition to the Shepherd Center and himself, numerous other doctors also saw similar lymphocyte count declines and lymphocytopenia in their patients.   Dr. Zamvil published his findings in an article released on February 12, 2015.   Despite the fact that Dr. Zamvil received compensation from Biogen, he felt it was important to get the truth out regarding the safety profile of Tecfidera.

73.     Dr. Zamvil stated that the drastic reduction in lymphocytes in patients caused by Tecfidera was alarming to both him and his colleagues in the medical community.  Thus, after the PML death and Dr. Zamvil's study in February 2015, numerous doctors stopped prescribing Tecfidera.  According to Dr. Zamvil, following the October 2014 announcement of the first PML death, everything changed.

74.     In addition, Dr. Zamvil reported that he was actively discontinuing patients off of Tecfidera following the PML death and the release of his study in February 2015.  Dr. Zamvil confirmed that he almost completely stopped prescribing Tecfidera.  Further, he confirmed that Biogen knew that he was discontinuing patients off of Tecfidera.

**D.      Defendants Announce the First Tecfidera Patient Death from PML but Reaffirm Confidence in Tecfidera**

75.     On October 22, 2014, Biogen reported its 3Q 2014 earnings of $2.51 billion, including Tecfidera earnings of $787.1 million.  Biogen also reported for the first time that an MS patient treated with Tecfidera had died of pneumonia after developing a rare brain infection from PML.  The Company stated that it "reported the case to the regulatory authorities and will work with them to confirm that the language on [Tecfidera's] label provides patients and their physicians appropriate information . . . ."

76.     Kingsley assured the market, however, that Defendants remained confident in Tecfidera:

> *[W]e are very comfortable with the trajectory of the product right now*.  We're very comfortable as we talked about the portion of new starts and switches we are getting.
>
> Nothing significantly off plan from our standpoint.  I think we feel pretty good about the performance.

77.     Clancy stated that "there is meaningful, still meaningful growth in Tecfidera in the United States, as we continue to penetrate doc[tor]s and penetrate the marketplace."  Asked if

Defendants thought doctors would "reconsider use" of Tecfidera in MS patients who could be at risk for developing PML, Scangos responded only that they were "not in a position to make medical recommendations."   Defendants did not indicate that they expected any negative reaction from physicians.

78.     Analysts accepted Defendants' statements that the PML death would not have a material impact on Tecfidera.  An October 22, 2014 Cowen and Company report stated:

> Management disclosed for the first time a case of PML in a patient on Tecfidera who had a 3-year history of severe lymphopenia. . . . [T]he first report of PML in over 100,000 patients treated should not be concerning for the other 95% of the MS population.

79.     Similarly, an October 22, 2014 Guggenheim Securities, LLC report stated:

> Although additional PML cases would be a concern, we expect minimal impact from the single case on Tecfidera growth, given the event's rarity (1/~100K) . . . . PML death should have little/no impact on Tecfidera adoption . . . . Importantly, however, we believe Tecfidera's PML risk will be perceived as low, given a single case in >100K patients dosed.

80.     An October 22, 2014 report issued by RBC Capital Markets similarly stated:

> [W]e think Tecfidera remains on a healthy trajectory in big picture [*sic*] and unlikely to be materially negatively impacted . . . PML impact likely minimal . . . .

81.     On October 22, 2014, a Wells Fargo Securities, LLC analyst stated:

> BOTTOM LINE:  We see minimal commercial impact and believe shares are overreacting to the PML report.

82.     Despite Defendants' misdirection, the market reacted to Defendants' partial disclosure regarding Tecfidera's actual safety profile, resulting in a stock price drop of $22.55 per share, or approximately 7%, by mid-afternoon on October 22, 2014.

83.     On November 25, 2014, the FDA issued a warning to the public in response to the death of a patient from PML while using Tecfidera.  The FDA stated that the patient was not taking any other drugs associated with PML, and advised physicians and patients to monitor for

side effects.  The FDA further noted that "[a]s a result, information describing this case of PML . . . is being added to the Tecfidera label."

84.     On December 2, 2014, more than a month after announcing the PML death, Defendants claimed that the market for MS treatments was "moving to [oral medications] and the indicators we have is [sic] that Tecfidera is unquestionably the leading oral [drug]." Defendants further stated that Tecfidera's discontinuation rates were "very consistent," even though the Company hoped to "get better performance in the discontinuation rates over a longer period of time."

**E.      The PML Incident Materially Impacts Tecfidera Sales**

85.     The low lymphocyte counts that the Shepherd Center observed as a result of the tests it began conducting in the spring of 2014, and that the Shepherd Center communicated to Biogen *before* the PML death was announced, are the same underlying condition that led to the PML patient death that Biogen announced on October 22, 2014.   Indeed, the PML death confirmed for the Shepherd Center its conclusions regarding Tecfidera's safety profile.

86.     CW12 confirmed that Biogen was aware of the immediate and drastic impact the PML death had on Tecfidera sales and that it also resulted in many discontinuations.  Most of the doctors CW12 sold Tecfidera to discontinued patients off the drug because of the PML death.

87.     In CW12's 2014 Year-End Review written in February 2015, Regional Director Craig Brown wrote "your Atlanta South territory is one of [the] few in the nation that has a BIIB [Biogen] share above 50%," which leads to the reasonable inference that the rest of the nation was doing even worse than CW12's territory.

88.     CW11 was a Senior Territory Business Manager at Biogen from September 2012 to January 2016.  CW11's territory was in Pennsylvania and his largest client was the University of Pennsylvania's medical center.  CW11 confirmed that the October 2014 PML announcement

had a substantial impact on both physicians' and patients' safety perception of Tecfidera which, in turn, directly impacted sales. CW11 provided several internal Biogen documents that corroborate this information and set forth specific details regarding the impact of the PML patient death on Tecfidera sales and physician confidence.

89.     Tecfidera sales were very strong before the PML death was announced. CW11's mid-end review for 2014 stated that in "Q1 [of 2014] Tecfidera showed the most success at 120% of plan. Again physicians saw the efficacy, safety and desire from patients to be on an oral 2X daily treatment." The second quarter of 2014 was strong as well, with Tecfidera sales at 103.2% of plan.

90.     But CW11's sales of Tecfidera dropped precipitously immediately after the announcement that a patient had died while on Tecfidera, as confirmed by an internal Biogen document. CW11's 2015 mid-year review noted:

> 2014 was a very strong year in Q1, Q2, & Q3 for the entire portfolio. *Following the PML Q4 experienced immediate impact and it is as follow[s]:*
>
> **2014**
>
> Q4 TEC[FIDERA *sales were] 78% [of plan]* 74[sales]/94[target]
>
> **2015**
>
> Q1 TEC[FIDERA *sales were] 36.7% [of plan]* 29[sales]/79[target]
>
> Q2 TEC[FIDERA *sales were] 35.1% [of plan]* 20[sales]/57[target]

91.     CW11's year-end review in 2015 confirms that the third quarter of 2015 (the final quarter of the Class Period) was also negatively impacted:

> Q3 [2015] again was impacted with the additional news of PML. I am concerned about the impact from Penn as I previously mentioned they do not have a solid strategy in place to monitor lymphocytes in their patients so Tecfidera is no longer in their minds an easy to start drug.

92.     These figures confirm and bolster the information regarding drastically declining sales of Tecfidera that other Biogen employees throughout the United States confirmed during the same time period.  *See* ¶¶ 88-130.[3]

93.     CW11's mid-year review for 2015 evidences how the patient death immediately and drastically impacted physician confidence in Tecfidera *by the first quarter of 2015,* completely contrary to what Biogen was stating publicly:

> [Biogen's reduction in sales goals] demonstrated . . . how the Philadelphia market was impacted.  Unfortunately, Q1 could not be saved . . . Penn was the first account to proactively stop rxing [prescribing] Tecfidera upon the safety announcement.  Penn represents about 60% of the Philadelphia West territory. The impact was far beyond what we could have anticipated.  Dr. Jacobs had a lot of concerns about the safety of Tecfidera due to the fact that she was a PI for the trials of Tecfidera.  In addition many others expressed the same concern.  Q2 appears to [be] a bit more promising with Penn but the uptake has been stagnant. Gilenya[4] seemed to gain momentum as the oral of choice due to the safety with Tec.

94.     Biogen knew that Tecfidera sales would fall immediately after the PML death was announced, contrary to what Defendants were telling the public, because the Company quickly and drastically lowered sales targets for the drug.  CW11's mid-year review for 2015 quotes an internal Biogen email sent to employees in early 2015 stating that the Company was cutting sales goals for Tecfidera across all regions and territories for the second quarter of 2015:

> The residual impact of the safety event from 2014 along with competitive pressure has continued to impact Tecfidera performance in Q2, but several leading indicators of success are encouraging, such as physician intent to prescribe, and an improving efficacy perception.  To support your focus on executional excellence and establishing Tecfidera as the first choice, Tecfidera goals will be reduced by 15% across all territories and regions for Q2.[5]

---

[3] References to paragraph numbers correspond to paragraphs in this Amended Complaint.

[4] Gilenya is a drug used to treat MS sold by Novartis.

[5] CW11 also confirmed that Biogen announced no other adjustments to sales goals for other drugs during his tenure.

95.     Based on internal Company documents, Biogen tracked CW11's sales targets and performance on a quarterly basis.  The 15% reduction in Q2 2015 was just a beginning, because his sales goals were lowered even more that quarter—by a whopping 28%.  And his sales goals already had been lowered for Q1 2015 by 16% from the previous quarter:

| Quarter (* = Class Period) | Tecfidera Sales Goal (Units) | Change Over Prior Quarter (Number / Percent) | Change Over Same Quarter, Prior Year (Number / Percent) |
|---|---|---|---|
| Q1 2014 | 85 | -- | -- |
| Q2 2014 | 94 | +9 / +11% | -- |
| Q3 2014* | 95 | +1 / +1% | -- |
| Q4 2014* | 94 | -1 / -1% | -- |
| Biogen announces PML death Oct. 22, 2014 (during Q4 2014) | | | |
| Q1 2015* | 79 | -15 / -16% | -6 / -7% |
| Q2 2015* | 57 | -22 / -28% | -37 / -39% |
| Q3 2015 | 44 | -13 / -23% | -51 / -54% |

96.     During this same time period, internal Biogen documents also confirm that CW11's sales goals for a different MS drug—Tysabri—remained steady, demonstrating that the decline in sales goals was limited to Tecfidera:

| Quarter (* = Class Period) | Tysabri Sales Goal (Units) (Pre-Class Period) |
|---|---|
| Q1 2014 | 13 |
| Q2 2014 | 15 |
| Q3 2014* | 15 |
| Q4 2014* | 14 |
| Q1 2015* | 14 |
| Q2 2015* | 17 |
| Q3 2015 | 16 |

97.     CW11 also provided a PowerPoint slide deck titled Biogen "2015 Q2 Quarterly Business Review – Philadelphia West" that confirms not only the immediate and material impact of the PML death on Tecfidera sales and discontinuations, but that Biogen was aware of it.  The

Quarterly Business Review states that safety was a major concern at the University of Pennsylvania and indicates that patients were being discontinued off Tecfidera:

> In the oral market Tecfidera is down and Gilenya is up.  Major factors: SAFETY is a major concern at Penn.  *PML and low lymphocyte counts (in the upwards of 4 months after being DC'd [i.e., discontinued] seem to have the most impact on their use of Tecfidera.*  In addition they have seen breakthrough with Tecfidera patients and believe Gilenya is more efficacious.  Copaxone is considered their safest alternative.

98.     The reference to a "breakthrough" is explained later in the Quarterly Business Review, where it is noted among patients taking Tecfidera, diseases were "breaking through." The same slide also explains the challenges Biogen faced:

> Challenges: UPENN – They believe there is a direct correlation between JCV[6] status and PML with Tec.  Patients may not be started on Tec if they are positive.  Also have concerns with the lymphocyte counts in tec patients, when they go below 500 they are not going up to normal for outwards of 4 months.  They have also sited [sic] breakthrough disease with tec, more than they have been with Gilenya.

99.     The Quarterly Business Review concludes with a slide titled "2015 Territory Critical Success Factors" that demonstrates Biogen knew, early in the Class Period, that the PML death was having a drastic impact on Tecfidera:

- *Turn Tecfidera around ASAP*
- Major focus on UPENN to *get them back to being confident in the safety and efficacy because their attitudes and philosophies are transferring to the community*
- They are 60% of our direct business and influence 60% of our territory.

100.     Numerous additional confidential witnesses reported that, following the PML death, Tecfidera's safety profile deteriorated and, as a result, sales dropped significantly.  CW1 was a Biogen ABM from November 2010 to June 2015, and was responsible for parts of southern Florida and Puerto Rico.  CW1 reported to Regional Director Robert Nelson, who

---

[6] JCV is a virus associated with PML.

reported to Senior Sales Director Keith Ferguson, who reported to Vice President Todd Nichols, who reported to Vice President of U.S. Commercial Joe Ciaffoni, who reported to Scangos. According to CW1, Tecfidera sales in his region dropped steeply and immediately after the public announcement of the PML death, and there was a large drop in new prescription sales of Tecfidera beginning around November 2014 by almost all of the neurologist customers in his sales territory.

101.    According to CW1, by December 2014, Biogen's neurologist-customers were taking patients off of Tecfidera due to the first PML case.  CW1 explained that his neurologist customers tended to be conservative, especially with immune-suppressive treatments.  According to CW1, Tecfidera had immune-suppressive properties even though the drug was not originally considered to be an immune-suppressive agent.  But he believed that, following the PML death, Tecfidera eventually came to be considered to be an immune-suppressive agent.

102.    CW1 explained that patients received 3-month dosages per prescription at a time, and he noticed his weekly reports indicating more and more drops in his 3-month prescription rates for Tecfidera beginning at the end of 2014, and continuing up until the end of his tenure.

103.    CW1 became aware of a severe drop in Tecfidera sales across the country following the PML announcement because he participated in "emergency" nationwide Biogen conference calls in December 2014 and January 2015 to address the declining sales of Tecfidera. CW1 recalled that there were "emergency calls" to address the sales drop at both the national and regional levels.  CW1 recalled that the national calls were led by Senior Vice President of U.S. Commercial Joe Ciaffoni and Senior Sales Director Keith Ferguson.  CW1 explained that one of these emergency calls, between December 2014 and January 2015, featured a Biogen-created slide presentation with graphs based on national data showing a drop in Tecfidera prescriptions

and an increase in the prescriptions of competitor MS treatments.  CW1 believed that this data showed an increase in discontinuations (and not just a halt on new prescriptions).  In addition, CW1 recalled that these slides showed that the drop in prescriptions was nationwide, and not localized to any one geographic area or region.

104.    CW1 also personally witnessed an immediate impact on his Tecfidera sales in his area, including his largest customer, the MS Center at the University of Miami.  CW1 described his working relationship with the University of Miami's neurologists as very close.  CW1 recalled doctors telling him that they were discontinuing a "significant number" of patients off of Tecfidera because of the first PML case. CW1 recalled seeing his daily metrics indicating a decrease in the use of Tecfidera by (then) current users at the MS Center at the University of Miami, as well as few (if any) prescriptions for new patients.

105.    CW1 recalled that on a regional conference call chaired by Regional Director Robert Nelson in late 2014 following the PML incident, Nelson told ABMs that their region was not the only one in which Tecfidera sales were poor—according to Nelson sales were down in almost every region across the United States.

106.    CW1 also was aware, based on conversations with ABM colleagues responsible for other territories, that MS Centers much larger and busier than the University of Miami stopped writing Tecfidera prescriptions starting at the end of 2014/early 2015.  These included Biogen's most prolific writers of Tecfidera prescriptions such as the MS Centers in Atlanta, New York, Los Angeles, and Ohio.

107.    CW2 was a Market Research Manager for Biogen from 2005 to December 2014, reporting to Antonio Melo, the Senior Manager of Business Planning.  CW2 attended a Company Town Hall meeting in November 2014 led by Scangos.   According to CW2, Scangos's

presentation (which took place the month after the PML death was announced and included a visual component that reflected his talking points) stated that "the overall sense of the trajectory [at Biogen] was changing."  The Town Hall meeting also included a presentation on potential organizational changes as a result of the PML death.[7]

108.    CW3 was a Biogen ABM responsible for certain parts of southern Florida and Puerto Rico from May 2012 to June 2015, reporting to Robert Nelson and then Manuel Dueno, who reported to Senior Sales Director Keith Ferguson, who reported to Todd Nichols, who reported to Senior Vice President of U.S. Commercial, Joe Ciaffoni.  CW3's responsibilities included selling Tecfidera to neurologists.  CW3 stated that his Tecfidera sales were strong until late 2014/early 2015, when sales dropped dramatically and failed to recover by the time he left Biogen in June 2015.  CW3 confirmed that there was a large drop in new prescription sales of Tecfidera beginning around November 2014 by almost all of the neurologist customers in his territory.  Following the PML death, CW3 said that his prescriptions went from approximately five new prescriptions per week before the PML death to zero new prescriptions in October and November 2014.  Moreover, according to CW3, new prescriptions for Tecfidera never recovered by the time he left Biogen in June 2015.  Based on conversations with his neurologist customers, CW3 attributed the decline in sales to the PML death and the subsequent FDA label change in November 2014.  CW3 further recalled that neurologists at the University of Miami directly told him around November 2014 that they were not going to write Tecfidera prescriptions for new patients unless the patient specifically asked to be put on Tecfidera.

109.    CW3 explained that he participated in regularly scheduled conference calls (he estimated that they were sometimes held every week and other times every-other-week) for the

---

[7] The inference that the trajectory was changing because of the PML death is properly drawn given the timing of the meeting.

Southeast Region during which his fellow regional ABMs recounted how they were experiencing big declines in their Tecfidera sales. CW3 recalled these concerns being expressed on calls beginning in January 2015. According to CW3, ABMs in other Biogen regions also reported that their Tecfidera sales had decreased dramatically by at least January 2015.

110.    According to CW1, Biogen instructed ABMs to downplay the significance of the PML death in order to convince doctors to continue to prescribe Tecfidera. Specifically, in attempting to deal with the fallout of the first PML, there was a "shift" where the Medical Science Liaisons were instructed to proactively make appointments with neurologists through Biogen's Thought Leader Liaisons and ABMs to discuss the case. According to CW1, this effort was undertaken in order to convince doctors to continue to prescribe Tecfidera. CW1 explained that soon after the PML death, Thought Leader Liaisons and ABMs were scheduling Medical Science Liaison Appointments with neurologists "24/7."

111.    CW3 similarly confirmed that Medical Science Liaisons who worked for Biogen were proactively approaching doctors in his region to address the safety profile concerns. According to CW3, following the PML death, Medical Science Liaisons (who he advised were usually doctors themselves) were directed by Biogen to request meetings with neurologists to address Tecfidera's safety profile in an effort to do damage control.

112.    CW3 attended a national sales meeting in Texas around March 2015, where the PML incident was described as a "market event" and it was explained that Tecfidera sales were not on track. According to CW3, speakers at the meeting stated that sales would need to pick up again if the Company was going to meet expected 14-16% revenue growth.

113.    CW3 stated that ABMs from around the country told him that doctors were upset following the PML death and that sales were dropping across the country. He recalled hearing

this information starting around October and November of 2014.  He confirmed that ABMs in Los Angeles, New York, Ohio, and Atlanta all told him that the PML death had a big impact on sales in their regions.

114.    CW1 also recalled a national sales meeting in Texas in March 2015.  According to CW1, senior Biogen leaders at the meeting acknowledged that the PML death definitely was impacting Tecfidera sales.  CW1 stated that at a Tecfidera "town hall" meeting led by Joe Ciaffoni, Keith Ferguson, and Todd Nichols, metrics and graphs were presented that showed a sharp decline in Tecfidera sales in most regions.  According to CW1, one presenter stated that "we understand that the market event [i.e., the PML incident] has had an impact on [Tecfidera] sales."

115.    CW4 was a Biogen ABM from March 2006 to June 2015 and was responsible for parts of Kansas and northern Oklahoma.  CW4's duties included selling MS products, including Tecfidera, to neurologists.  CW4 reported to Regional Director for the Midwest region Renee Mercer, who reported to National Sales Director Bill West.  CW4 stated that his Tecfidera sales dropped appreciably very early in 2015, while sales of other MS drugs continued to do very well. According to CW4, new prescription rates dropped, and physicians were transferring patients off Tecfidera and onto different therapies.  CW4 received quarterly sales goals from Biogen's corporate office and stated that he did not meet his Tecfidera sales goals in 2015.  In 2015, CW4 participated in biweekly conference calls with other regional ABMs and Renee Mercer, where Midwest region ABMs reported that they were not meeting their Tecfidera sales goals.  This trend continued up until the time of CW4's departure in June 2015.

116.    CW5 was a Biogen ABM responsible for neurology sales, including MS drugs, in areas of North Carolina and Virginia (in the South Region) from April 2013 to April 2015.  CW5

reported to Jason Romano, the Associate Director of Divisional Operations Patient Services, who reported to Keith Ferguson, the Senior Sales Director, who reported to Todd Nichols. CW5 stated that while Tecfidera was his "lead product" by early 2014, he recalled a "big slowdown" in Tecfidera market expansion beginning in late October/November 2014 that he discussed with other Biogen neurology ABMs. According to CW5, there was a link between the PML death and the drop in Tecfidera sales.

117. CW5 stated that other ABMs in the South Region discussed on conference calls how poorly their Tecfidera sales were doing throughout the first quarter of 2015. CW5 also began to experience a serious downturn in "start forms" for Tecfidera at the end of 1Q 2015, from 10 to 14 per week to 3 per week around March 2015.

118. CW6 was a Biogen ABM in the Company's Western Region, responsible for sales in Montana, Idaho, and Wyoming from 2011 through August 2015. CW6 reported to Regional Sales Manager Chris Stoll, who reported to Senior Sales Director Bill Ames. CW6 stated that prior to the October 2014 announcement of the PML death, Tecfidera had a "hockey stick" (i.e., exponential) growth. Following the October 2014 announcement, CW6 stated that his Tecfidera new starts declined by the end of 2014, and that after October 2014, new prescriptions significantly slowed down. According to CW6, there was a "significant slowdown of people being put on" Tecfidera, and people were more cautious following the PML death. CW6 learned during conference calls that the decline or stoppage in new Tecfidera patients following the PML death occurred in other regions following the Company's October 2014 announcement. CW6 stated that Tecfidera sales never rebounded in 2015 before his departure in August 2015, and there was a significant slowdown during that time.

119.    CW7 was a Biogen ABM in the Company's Virginia region from April 2011 to June 2015, responsible for sales of Tecfidera to neurologists in parts of Virginia, West Virginia, and Maryland.  CW7 reported to Regional Sales Director Jason Lavinder, who reported to Senior Sales Director-East Stephen Hulse.  CW7 stated that his Tecfidera sales were consistently good prior to the announcement of the PML death in October 2014, but that after the PML announcement his territory "took a hit" beginning in December 2014 or January 2015.  Although CW7 could not recall exact numbers, he explained that the drop in Tecfidera sales was big enough that he and his territory team consistently missed their sales goals at an increasing rate until his tenure with the Company ended in June 2015.

120.    CW7 witnessed both doctors discontinuing patients off of Tecfidera and a drop in new prescriptions after the PML case was reported.  CW7 advised that the discontinuations were by more than one neurologist-customer of his, and he specifically recalled that Dr. Glenn Deputy of Harrisonburg, Virginia (as one example) pulled his first Tecfidera patient off of Tecfidera soon after the PML death was announced in October 2014.

121.    CW7 recalled the National Sales Meeting in March 2015 where Tecfidera sales were discussed.  According to CW7, the drop in Tecfidera sales was acknowledged during that meeting.

122.    CW8 was the Senior Director of Commercial Operations for Biogen from August 2014 to November 2015, a position equivalent to Chief of Staff for the Head of Commercial Operations.  CW8 initially reported to Todd Nichols and later to Joe Ciaffoni, the Senior Vice President of U.S. Commercial.  CW8's responsibilities included oversight of operations related to Biogen's MS and hemophilia drugs, including Tecfidera.  During his tenure at Biogen, CW8 handled operational issues related to Tecfidera on a daily basis.  According to CW8, Tecfidera

was on a growth trajectory when he joined Biogen in August 2014, but Tecfidera's trajectory changed after the October 2014 PML death was announced. CW8 stated that Tecfidera sales were immediately impacted following the PML death.

123. CW9 was a Biogen ABM responsible for parts of Connecticut and New York from July 2009 to March 2015, reporting to Regional Director Karen Grant, who reported to National Sales Director Stephen Hulse, who reported to Vice President Todd Nichols, who reported to Senior Vice President of U.S. Commercial Joe Ciaffoni. CW9's responsibilities included selling Tecfidera to neurology practices and an MS center. CW9 observed that the ABMs in his territory were not compensated for their Tecfidera sales in 1Q 2015, i.e., they did not meet their Tecfidera sales for that quarter.

124. CW13 was employed by Biogen in the Company's Raleigh, North Carolina corporate office from September 2012 to January 2016. His titles at Biogen before that role included MS Case Manager, Active Support Coordinator, and Patient Services Coordinator. According to CW13, his responsibilities as MS Case Manager included supporting the Biogen MS sales team. As MS Case Manager, he reported to TOUCH Compliance and Data Team Supervisor, Megan Kuykendall, who reported to Operations Manager, Michael Hall, who he believed reported to an Associate Director, who reported to Senior Director of Customer & Partner Service, Pavlos Pavlidis, who reported to Vice President of Patient Services, Mike Krzan.

125. CW13 recalled that he was averaging around 40 to 50 Tecfidera new start forms per month leading up to the PML death, followed by a drop immediately afterwards. CW13 also recalled hearing from colleagues that patients were being switched from Tecfidera to other drugs. Further, CW13 also recalled that, following the PML death, case managers and ABMs

were pushed even harder by their superiors to sell Tecifdera.   He also recalled that when Tecfidera enrollments started going down, following the PML death, there were Manager Meetings every day between Kuykendall and Hall to discuss enrollment form numbers and turnaround times.

126.    CW14 was employed by Biogen from July 2012 to February 2016 as ABM.   His responsibilities included selling Biogen MS treatments such as Tecfidera.   According to CW14, his territories were Buffalo, central New York State, and Erie, Pennsylvania.   He added that his territory was part of Biogen's New York State region, which was part of Biogen's East Division. CW14 reported to Regional Director of Sales – Neurology, Wofe Cornwall, who reported to Senior Sales Director – East, Stephen Hulse, who reported to Vice President of Sales and Field Operations, Todd Nichols, who reported to Senior Vice President of U.S. Commercial, Joe Ciaffoni, whom he believed reported to Kingsley.

127.    CW14 recalled witnessing a "screeching halt" to his new Tecfidera prescriptions and "lots of discontinuations" of existing Tecfidera patients immediately after Biogen publicly announced the first PML death linked to the drug in October 2014.   CW14 specifically recalled these adverse effects on his Tecfidera sales started "immediately by November 2014."

128.    CW14 further explained that the entire New York region (which consisted of three separate territories) saw a big drop in Tecfidera prescriptions soon after the initial PML disclosure.   CW14 recalled regular New York State Regional conference calls in which ABMs from the other three territories confirmed that there were big drops in Tecfidera prescriptions.

129.    In addition, CW14 recalled participating in non-regularly scheduled East Division conference calls starting "right after" the October 2014 PML announcement that were attended

by ABMs from every territory from his division who cited varying amounts of decreasing Tecfidera sales.

130.    CW17 was a former Executive Territory Business Manager and Field Trainer at Biogen from September 2007 until November 2015.  Before leaving Biogen, CW17 reported to Regional Director Karen Grant.  CW17 was responsible for selling pharmaceutical products for Biogen, including Tecfidera.  CW17 reported that his Tecfidera sales dropped by at least 25% following the PML death.

**F.    Defendants Track Tecfidera Sales and Reduced Sales
Compensation Goals in Light of Decreased Sales**

131.    CW10 was an Executive Assistant from July 2012 to October 2015 in Biogen's Program Leadership & Management team, supporting numerous programs including Tecfidera. CW10's responsibilities included supporting the Program Executive and Program Director of Tecfidera, initially Alpna Seth ("Seth"), who then was replaced by Uthra Sundaram ("Sundaram") prior to the October 2014 PML announcement.  Sundaram was a "dotted line" report to Scangos.  According to CW10, Sundaram met weekly with Kingsley and Scangos, and quarterly with Clancy.

132.    CW10 stated that after the PML death, Biogen's sales and commercial teams monitored sales numbers through various reports.  According to CW10, Biogen immediately reached out to the top prescribing doctors as well as big pharmaceutical companies such as CVS Caremark and Walgreens after the PML announcement.  CW10 stated that Biogen's commercial team performed "deep drill downs" into sales numbers, including reviews of specific territories that were lagging, and that Sundaram went on "ride-alongs" with Biogen's Medical Science Liaisons, where Sundaram would meet with doctors to discuss the PML death.

133.    According to CW10, the entire Tecfidera team would meet during weekly program team meetings to discuss Tecfidera sales numbers and how the PML death affected sales.  CW10 stated that Sundaram communicated with Scangos and other senior executives following those meetings.  CW10 further stated that Sundaram was involved in the Tecfidera label change after the PML death and knew that the label change would immediately lead to lost sales.

134.    According to CW13, everything was reportable and "everyone in leadership had access to reporting metrics."  CW13 explained that the reportable metrics included how many new start forms came in for Tecfidera, the number of patients who "graduated" (started taking Tecfidera) and their turn-around times.[8]  CW13 explained that a patient was considered "graduated" when they used the drug (in this case Tecfidera) for the first time.  He added that sales leadership always relied on and monitored new start forms and graduation rates, and identified how many new start forms were needed to generate sales.  Further, he explained that "sales leadership" received quarterly reports on how many patients had "graduated" (i.e., switched to Tecfidera).  He also believed that more senior level executives at corporate headquarters were provided with (or accessed) these reports at least on a quarterly basis.  CW13 recalled a bigger push from his direct supervisor to provide updated reports starting and continuing after the PML case was announced.

135.    CW1 had access to his region's sales information, including the number of prescriptions written.  According to CW1, Regional Director Nelson would access other regions' sales metrics to compare their region's performance with that of other regions in the United States.

---

[8] According to CW13, turnaround time refers to the time in between Biogen's receipt of a start form and when the patient actually takes the first dose of Tecfidera.

136.    CW4 also confirmed that the Company tracked sales metrics and prescriptions. CW4 stated that when a prescription was sold, Biogen's headquarters knew about it.

137.    CW7 also stated that corporate headquarters would have had up to date insight into new prescription rates.   CW7 stated that forms needed to be filled out for every new Tecfidera prescription and that corporate offices were given copies of these forms.   According to CW7, his territory's sales reports were updated nightly and included the ID number assigned to every new patient and the name of the prescribing neurologist.   CW7 stated that the number of new prescriptions dropped after the PML announcement.

138.    According to CW1, sales goals for Tecfidera were adjusted downward in December 2014 to make it easier for ABMs to make compensation goals.   However, CW1 stated that many ABMs in his region still failed to meet the lowered goals.

139.    CW5 confirmed that the Company lowered Tecfidera sales goals around the same time.   According to CW5, in January 2015, Todd Nichols, Biogen's Vice President, sent an email to ABMs that announced compensation thresholds for sales representatives were being lowered because of "lower guidance due to unforeseen market events" that CW5 understood were based on problems with Tecfidera sales.

140.    In addition, CW8 (Biogen's former Senior Director of Commercial Operations) explained that in the pharmaceutical industry "sales are tracked daily."   CW8 also confirmed that Joe Ciaffoni, Biogen's Senior Vice President of U.S. Commercial, would meet the G8 at least once a month.

## G.    Defendants Downplay Any Negative Impact on Tecfidera Performance

141.    Following the announcement of the PML death and the FDA's advisory, and contrary to the material decrease in sales reported internally by sales personnel across all regions,

Defendants publicly dismissed concerns that the PML death would materially impact Tecfidera performance.  Defendants reassured investors that Tecfidera would continue to drive double-digit revenues for Biogen in 2015.

142.    CW16 was a former Senior Vice President in Biogen's Worldwide Medical Organization.  He served as the Head of Medical Affairs from January 2014 to March 2016. CW16 explained that Biogen's senior executives were aware of the external communication measures that the Company's medical teams were conducting pertaining to the PML event.

143.    On January 29, 2015, Biogen announced its 4Q 2014 results, reporting Tecfidera revenues of $916 million, or approximately 35% of the Company's total revenues.  Defendants reiterated that Tecfidera performance remained strong and stated that they had not seen any meaningful change in discontinuation rates:

> [W]e believe that [Tecfidera] will continue to grow in the US and will grow substantially in international markets, so that we anticipate that 2015 will be another year of meaningful growth for Tecfidera and for our portfolio of MS products, in general.
>
> . . . .
>
> Tecfidera continued to demonstrate its strong performance, which we believe is a testament to its attractive product profile, combining strong efficacy, favorable safety and tolerability, and the convenience of oral administration.
>
> . . . .
>
> Importantly, **_we have not noticed a meaningful change in Tecfidera discontinuation rates_**.  We are actively engaging physicians to ensure proper education on the label update.  And we believe in the continued growth potential of the product in the US.

144.    Defendants issued FY 2015 guidance of "revenue growth between _14% and 16%_" over 2014, with "Tecfidera [as] the largest contributor to our overall revenue growth."  When asked on Biogen's quarterly earnings call what Defendants were seeing "in terms of physician reactions to the PML case that might be slowing intake," Kingsley reiterated that there was no

"meaningful change" because physicians were not pulling patients off Tecfidera, and that Defendants "have the right education [for physicians] in place."

145.    Analysts accepted Defendants' assurances.  For example, Deutsche Bank noted on January 30, 2015 that "FY14 results were driven by the strength of Tecfidera with 4Q revenues. . . . Management continues to see Tecfidera growing in 2015.  Guidance was in line; however given B[iogen]'s history with beating expectations, we expect the guidance sets them up well to perform in 2015."

146.    Biogen's common stock price increased by $35.91 per share on January 30, 2015, an increase of more than 10%.

147.    During a February 25, 2015 healthcare conference, Kingsley stated that "Tecfidera is a terrific product that is going to perform very well in the market.  It is – from the time it launched, it has really driven a lot of conversion in the market or acceleration in the conversion of the market to orals.  It's got a good profile. . . . We've talked in the past we are getting about a third of new starts, which is a very good thing and we're getting a nice portion of the switch pool as well."

148.    Kingsley also downplayed the impact of the PML incident on Tecfidera's safety profile, stating that there was no hesitancy by physicians to prescribe Tecfidera, calling the drug "resilient" and reaffirming Tecfidera as a "meaningful growth driver":

> *You would expect to see some hesitancy among some set of physicians* before you get them to have a conversation about that, but *the product has been quite resilient* . . . in light of that.  In 2015, we think *it is still a meaningful growth driver*.  US will still see growth and we have geographic expansion as we are rolling out to more markets outside the US.

149.    Kingsley was asked:  "[D]o you think a lot of the PML noise or news has gotten out there and have you started to see a reacceleration of things when you go out into the – what's the feedback from the salesforce?"  Kingsley responded that Tecfidera was still "capturing a

third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety," emphasizing that there was "no evidence" of "any change in the discontinuation rate."

### H.   Defendants Partially Disclose the PML Incident's True Impact on Tecfidera Performance

150.   On the morning of April 24, 2015, Biogen announced its 1Q 2015 results. Tecfidera revenues were $825 million, below the market's consensus estimates.  For the first time, Defendants partially acknowledged that the PML death was impacting Tecfidera sales both in the United States and Germany.  Scangos noted that "Tecfidera had a more challenging quarter, due to a number of issues, including an overall slowing of the MS market, the recent launch of Plegridy, *the single PML case reported last year*, and some first-quarter financial dynamics . . . ."  In response to this partial disclosure of the PML incident's impact on Tecfidera revenue, Biogen's common stock price dropped by $28.57 per share, or by 6.64%, on April 24, 2015.

151.   Defendants, however, continued to mislead investors regarding the true extent of the negative impact from the PML death on Tecfidera's performance.  Scangos reaffirmed that "our long-term outlook for Tecfidera, and for our entire MS portfolio, remains strong."  Clancy notably did not update or correct the Company's January 2015 guidance of 14-16% revenue growth.

152.   According to Kingsley, the Company had successfully educated physicians about the PML death and that prescribing patterns were returning to normal.  While physicians saw "some hesitance" among patients, Kingsley stated that "our internal market research suggests that physician intent to prescribe may be improving.  We believe these data indicate that we are assisting physicians in putting the updated label into context."

153.    Analysts acknowledged the apparent impact of the PML death on Tecfidera, but accepted Defendants' positive outlook.  A Deutsche Bank report on April 24, 2015 titled "Defending [Biogen].  Weakness on 1Q miss is overdone" noted that Biogen stock's "weakness is overdone in the light of MGMT comments.  The Management noted that if the US trajectory on Tecfidera does not improve, they may come in at the lower end of the previously provided revenue guidance . . . ."

### I.    Defendants Continue to Downplay The True Extent of the Negative Impact on Tecfidera

154.    At a May 6, 2015 Deutsche Bank conference, when questioned again about the PML incident's impact on Tecfidera, Clancy stated that *any impact had stabilized*:

> I mean, certainly as you noted that *there was a safety event that we talked about in October on Tecfidera that seems to have had a little unfavorable impact on the safety perceptions* that we saw register in a number of our kind of the way we kind of do attitudinal surveys with physicians, *that has stabilized.*

155.    At a May 13, 2015 Bank of America healthcare conference, Doug Williams, Biogen's Executive Vice President of Research & Development, emphasized that physician perceptions of Tecfidera's safety profile were the same as prior to the PML death:

> We've done some survey work recently that would suggest that physicians have kind of digested the information, taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event.  That's sort of the first step in being able to get back on that trajectory of putting new patients on the drug.

156.    Similarly, at a May 27, 2015 Sanford Bernstein conference, Clancy reiterated that physicians' views of Tecfidera safety had "stabilized":

> Certainly there was a safety event late last year where physician perceptions on the safety profile declined a little bit, still in a very good competitive profile vis-a-vis other therapies in the marketplace.  *Those have stabilized, right.*

157.    Clancy also emphasized that Defendants "continue to see our share of capturing of new scripts and switched scripts higher than our share.  That's usually an indication that we'll

get upward momentum in the business" and that "we'd be surprised if we don't see forward momentum from here."

158.     Biogen's common stock price closed at $402.92 per share on May 27, 2015, up $10.04 per share from the previous day, an increase of more than 2%.

**J.     The Whole Truth is Revealed – Biogen Cuts Previously Confirmed Guidance in Half**

159.     On July 24, 2015, before the market opened, Defendants cut in half previously confirmed guidance for revenue growth, attributing the change to Tecfidera performance and stating in a Form 8-K that "Biogen's mid-year update to its full year 2015 financial guidance consists of the following components:  Revenue growth is expected to be approximately 6% to 8% compared to 2014, a decrease from prior guidance based largely on revised expectations for the growth of Tecfidera."

160.     Appearing on CNBC prior to markets opening on July 24, 2015, Jim Cramer stated that Biogen's announcement was "a horrendous guide down" from the previous "guidance for their MS drug Tecfidera" and that Biogen's disclosure was "shattering" and a "gaffe[] to the people who have loved this stock."

161.     In response to the Company's July 24, 2015 disclosures, Biogen's stock price fell by over 20% in a single day on unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,629,730 shares.

162.     On July 27, 2015, J.P. Morgan issued a report stating that:

management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box . . . . The messy 1Q report was supposed to be a one-time anomaly.  Instead, 2Q results and revised guidance seem to

indicate the problem is much more systemic.  It's no wonder that investor confidence is shaken.

Morgan Stanley echoed J.P. Morgan, noting the same day that "[Biogen management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

### K.    Post-Class Period Events

163.    At a September 18, 2015 Bank of America Merrill Lynch health care conference, Kingsley acknowledged that the PML death had a significant impact on the safety profile of the drug:  "[i]t was clear to us that we were going to get a – some kind of a downtick in the safety profile that *would have some kind of an impact on physician behavior*, but we couldn't tell." Kingsley also admitted that the FDA label change was a meaningful change statement:  "the [Tecfidera] label was so clean [prior to the PML incident], the first PML event was a pretty big change statement for a broad base of physicians who were very comfortable with having essentially no safety issues."

164.    As Executive Vice President for Commercial Operations, Kingsley was responsible for overseeing Biogen's sales force and commercial operations.  On October 9, 2015 Biogen announced that Kingsley would "leave the company and a search has been initiated for a permanent replacement."  When the Company announced Kingsley's departure, Scangos noted that Kingsley had been responsible for the launch and introduction of Tecfidera into the market. Kingsley's abrupt departure occurred only two months after the Company's disclosures regarding Tecfidera.  The strong logical inference is that Kingsley was fired because of the events concerning Tecfidera.

165.    On October 21, 2015, Biogen announced that it would eliminate approximately 11% of its workforce.

**VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

**A.    July 23, 2014 2Q 2014 Biogen Inc. Earnings Call**

166.    On July 23, 2014, the first day of the Class Period and prior to the opening of the market, Biogen held an earnings call with analysts.  Defendants Scangos, Clancy, and Kingsley participated in the earnings call.  Kingsley made the following materially false and misleading statement regarding the safety profile of Tecfidera and its growth rate:

> ***T[ecfidera] in the US continued on a solid trajectory***.  T[ecfidera] has been broadly used across numerous patient segments.  Dually diagnosed, switches prompted by efficacy and non-efficacy reasons as well as patients returning to the market.
>
> ***We believe T[ecfidera] is generally viewed by physicians and patients as efficacious with an attractive safety profile*** and a manageable tolerability profile.  ***Importantly, patient retention rates have been similar to other marketed MS therapies and in line with our expectations***.

167.    During the call, Scangos also commented that "TECFIDERA continues to gain market share and we believe it's on track to become the leading MS therapy in the U.S."

168.    Kingsley's statement regarding Tecfidera's "solid trajectory" and Scangos's statement that Tecfidera "continues to gain market share" were both materially false and materially misleading because a leading source of Tecfidera prescriptions in the United States, the Shepherd Center, had already halted issuing new prescriptions of Tecfidera in light of the blood tests that it conducted demonstrating the dangerous side effects of Tecfidera.  This resulted in a domino effect on other prescribers of the drug in the Atlanta region.

169.    Furthermore, internal Biogen documents demonstrate that Biogen was aware of this sequence of events.  In addition, Kingsley's statements regarding the "attractive safety profile" of Tecfidera in the eyes of physicians and patients was materially false and misleading because the Shepherd Center had observed dangerous side effects as a result of blood work it

conducted on MS patients taking Tecfidera and advised Biogen of its conclusions and concerns during the second and third quarters of 2014.

### B.    July 23, 2014 2Q Press Release

170.    On July 23, 2014, Biogen also issued a press release touting its second quarter financial performance and increasing its 2014 financial guidance.  The press release included the following statements made by Scangos about Tecfidera:

> This past quarter highlighted significant accomplishments across our business, from the approval of ELOCTATE for hemophilia A, ***to the continued patient uptake of TECFIDERA in the U.S.*** and new markets worldwide, to strong clinical results for important emerging MS treatments.

171.    The press release also announced that Biogen had "increased its full year financial guidance" and that the change was "***a meaningful increase from prior guidance owing primarily to the growth of TECFIDERA in the U.S. and the E.U.***"

172.    Scangos's statement about the "continued patient uptake of TECFIDERA in the U.S." was materially false and misleading because the Company knew that the Shepherd Center, a leading source of Tecfidera prescriptions in the United States, had already begun taking patients off of Tecfidera as a result of its determination that Tecfidera was compromising patients' immune systems.  *See* ¶¶ 63-68.  Internal Biogen documents demonstrate that Biogen was aware of this development, the significant risk it posed to Tecfidera's safety profile, and the fact that other neurologists were changing their prescription patterns away from Tecfidera based upon the Shepherd Center's findings.  *See* ¶ 68.

173.    Analysts accepted Biogen's positive message about Tecfidera.  For example, on July 23, 2014, Cowen and Company issued a report stating that "Biogen's latest and greatest MS drug is Tecfidera, an oral drug with an excellent safety and efficacy profile."

174.    A July 23, 2014 Guggenheim report stated, "[a]s we believe Tecfidera has a clearly superior safety/efficacy profile . . . we continue to expect Tecfidera to rapidly become the dominant oral MS therapy in the E.U./U.S., with peak sales in the range of $7B."

175.    Also on July 23, 2014, BMO Capital Markets wrote that "BIIB noted that patient retention rates have been similar to those of other marketed MS therapies and in line with BIIB's expectations."

###    C.    September 11, 2014 Press Release

176.    Biogen continued to extol the safety profile of Tecfidera in a September 11, 2014 press release.  Specifically, Alfred Sandrock, Biogen's Chief Medical Officer, was quoted in a Company press release stating that "TECFIDERA continues to provide patients with effective oral treatment for MS that is supported by a growing body of data reinforcing its benefits and favorable safety profile."

177.    However, this statement was materially false and misleading because Biogen knew, beginning in August 2014, that Tecfidera was not as safe as the Company continued to state publicly.  Specifically, Dr. Thrower told Biogen executives in August 2014 that Tecfidera was compromising patients' immune systems in approximately 30% of the Shepherd Center's patients who were taking the drug.  *See* ¶¶ 63-68.  According to Dr. Thrower, those patients appeared to have laboratory values similar to those of a person suffering from AIDS and he immediately (1) started taking patients off of Tecfidera, and (2) stopped prescribing it for new patients.  *See id.*

###    D.    October 22, 2014 3Q 2014 Biogen Inc. Earnings Call and
             Partial Disclosure of the Truth

178.    On October 22, 2014, prior to the opening of the markets, Biogen held an earnings call with analysts.  Defendants Scangos, Clancy, and Kingsley participated in the

earnings call.   During this call, Defendants partially disclosed the truth regarding the safety

profile of Tecfidera.   Scangos stated:

> We would like to inform you that we have confirmed a case of PML in a patient being treated from TECFIDERA who recently died from complications of pneumonia.   Despite this tragic loss, we believe the overall positive benefit risk profile of TECFIDERA remains unchanged.
>
> The patient was treated with TECFIDERA for four and a half years as part of the ENDORSE study.   During the course of therapy, the patient experienced severe lymphopenia that lasted for over three and a half years.   Lymphopenia is a known risk factor for PML and can be caused by a number of factors, including treatment for MS, cancer, HIV.
>
> The current TECFIDERA label includes warnings and precautions regarding lymphopenia.   We reported the case to the regulatory authorities and will work with them to confirm that the language on our label provides patients and their physicians appropriate information regarding lymphopenia.

179.   In response to the partial disclosure of the truth regarding the safety profile of

Tecfidera, Biogen's common stock price dropped by $17.70 per share on October 22, 2014—

more than 5%—from $326.77 to $309.07.

180.   However, Defendants continued to mislead the market regarding the safety profile

of Tecfidera, its expected success in the market, and later, its actual success in the market.

181.   For example, Scangos immediately noted after announcing the patient death that

"we believe *the overall positive benefit risk profile of TECFIDERA remains unchanged*."

182.   Scangos's statement was materially false and misleading because the Shepherd

Center, a leading source of prescriptions of Tecfidera in the United States, had completely

stopped prescribing Tecfidera by August 2014, and was discontinuing half of its patients off the

drug.   Moreover, there is significant evidence that the Shepherd Center informed Biogen

executives of its safety concerns.   *See* ¶¶ 63-68.   And an internal Biogen document also confirms

that Biogen was aware of the Shepherd Center's conclusions, and that its actions had a domino

effect on other prescribers in the summer of 2014.   *See* ¶ 68.

183.    After announcing the PML death, Defendants downplayed the incident, despite the evidence that it was not a one-time event.  For example, in response to a question from an analyst at Cowen and Company on a conference call held on October 22, 2014, the following exchange took place about Tecfidera's trajectory:

**Eric Schmidt - Cowen and Company - Analyst**

Thanks for taking my question.  Maybe for Tony or Paul on TECFIDERA, looks like the growth on a quarter on quarter basis either absolute dollars or percentage basis, it looks a little bit lower in Q3 than, say, over any of the last four or five prior quarters.

Was there anything one time nature that you want to call out?  Or should we just assume that drug is on a different trajectory?

**Tony Kingsley - Biogen Idec Inc. - Head of Global Commercial Operations**

Thanks Eric, it is Tony.  ***Nothing big on a one time nature.  Inventories are moderating, I think a little bit in the channel***.

As always a little probably difficult to predict exactly, but look, we have always expected TECFIDERA's growth rate would moderate over time.  I think we are seeing a natural case of that.

***But we are very comfortable with the trajectory of the product right now.  We're very comfortable as we talked about the portion of new starts and switches we are getting***.

***Nothing significantly off plan from our standpoint***.  I think we feel pretty good about the performance.

184.    An analyst at Nomura Asset Management similarly asked about Tecfidera's growth going forward:

**Ian Somaiya - Nomura Asset Management - Analyst**

Thank you, just wanted to follow-up on the questions on TECFIDERA in the US.  You have gotten fairly rapidly to 20%, roughly 20% market share.

Just wanted maybe your thoughts on how we should think about growth going forward.  Factors we should consider when modeling our sales going forward.

And similarly from Europe, the sales came in a little bit below expectation.  Would you attribute more to that, would you attribute that more to the timing of

country and production, country rollout or was there a policy effect with the introduction last quarter?

**Tony Kingsley  - Biogen Idec Inc. - Head of Global Commercial Operations**

Yes, thanks Ian.  It's Tony.  So look, the way to think about TECFIDERA growth is what portion of new starts does TECFIDERA capture?

***We believe TECFIDERA is capturing a nice portion of new starts and should. Physicians are comfortable putting new patients on it***.

And then the bigger question, mathematically is what portion of switches.  And again we believe the product is capturing a meaningful portion of switches.

There is a third factor, which is market growth.  We have said, in some prior calls, that the market in the US has grown faster this year than it has, historically.  Some of it is what Paul talked about before, which was the switch from free to commercial patients.

There is also the dynamic of the quitter pool, we think has been favorable this year.  Essentially, TECFIDERA has probably kept people in the markets who might have quit the market.  So you have had additional growth on that standpoint.

185.    Kingsley's statements that Defendants were "very comfortable with the trajectory of" Tecfidera and that there was "[n]othing significantly off plan" about the drug were materially false and misleading because the Shepherd Center, a leading source of prescriptions of Tecfidera in the United States, had completely stopped prescribing Tecfidera by August 2014, and was discontinuing half of its patients off the drug.  Biogen was aware of the Shepherd Center's conclusions regarding the safety profile of Tecfidera and the domino effect it had on other prescribers during the second and third quarter of 2014.  *See* ¶¶ 63-68.

186.    Kingsley was also specifically asked about Tecfidera discontinuations by an analyst at Robert W. Baird and Company:

**Chris Raymond - Robert W. Baird & Company, Inc. - Analyst**

Hey thanks.  Just a follow-up here on TECFIDERA.  So we've done some of our own work on the discontinuation rate, and from at least from what docs are telling us, it looks like it's fairly flat and consistent with what define and confirm showed.

Can you guys maybe talk about the trends you are seeing there?  Are we right?
Or is there some other dynamic we should think about?

**Tony Kingsley - Biogen Idec Inc. - Head of Global Commercial Operations**

Yes, thanks Chris.  It's Tony.  *I think that is consistent with what we are seeing*.

As we have said before, ***the discontinuation rates are, we expect to be similar to
other inline therapies, over time***.  We think we believe the physicians are
learning to manage the GI intolerability issues, but you are still going to get some
off that.  ***So we believe your analysis is probably in line with what we are seeing***.

187.    Kingsley's statements regarding Tecfidera discontinuation rates, including his
affirmation that the discontinuation rates were "flat and consistent," were materially false and
misleading because he failed to disclose that the largest source of Tecfidera prescriptions in the
United States among MS centers, the Shepherd Center, was discontinuing half of its existing MS
patients that were taking Tecfidera off the drug because of its devastating side effects.  ¶¶ 63-68.

188.    Analysts' comments demonstrate the market accepted Defendants' comments.
On October 22, 2014, Guggenheim Securities, LLC wrote that the "PML death should have
little/no impact on Tecfidera adoption."  It also noted that "additional PML cases would be a
concern" and that "we believe Tecfidera's PML risk will be perceived as low, given a single case
in >100K patients dosed."

189.    Wells Fargo wrote on October 22, 2014 that "we do not believe the emergence of
a PML case, even in a patient not previously on Tysabri, is a huge surprise nor should it
substantially change Tecfidera use or adoption patterns."  Wells Fargo wrote that "BOTTOM
LINE:  We see minimal commercial impact and believe shares are overreacting to the PML
report."

190.    On October 22, 2014, Cowen and Company wrote that "the first report of PML in
over 100,000 patients treated should not be concerning for the other 95% of the MS population."
In a separate note that day, Cowen and Company also wrote, "Our thesis on B[iogen] is

unchanged.  We expect Tecfidera to become the leading MS drug and to capture ~30% share in a $16B+ and growing market."

191.    Jefferies wrote on October 23, 2014 that "we do not see this one case having any near-term commercial impact.  We note that the label clearly warns of lymphopenia [also known as lymphocytopenia] and recommends regular monitoring for this side effect."

### E.    December 2, 2014 Deutsche Bank BioFEST Conference Call

192.    On December 2, 2014, Clancy attended a Deutsche Bank conference and made the following materially false and misleading statements about Tecfidera:

**Robyn Karnauskas - Deutsche Bank - Analyst**

Tecfidera is capturing around a third of new patients and 40% of the switch market.

Do you think at this point Tecfidera is settling nicely at 35% market share in the overall market?  Or where do you see Tecfidera going?

**Paul Clancy - Biogen Idec Inc. - EVP, Finance & CFO**

[W]e still feel the market, broadly speaking, is moving to orals and *the indicators that we have is that Tecfidera is unquestionably the leading oral . . . we think there's plenty of tailwind still left*.

193.    Clancy's statements that "the indicators that we have is that Tecfidera is unquestionably the leading oral" and that Clancy believed there was "plenty of tailwind still left" were materially false and misleading because he knew there had been a "big slowdown" in Tecfidera market expansion by November 2014 and that sales were down in almost every region in the United States.  *See* ¶¶ 88-130.  Furthermore, this statement was materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing

Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in its safety profile.  *See ¶¶ 63-74.*

> **F.  January 12, 2015 J.P. Morgan Healthcare Conference**

194.   On January 12, 2015, Scangos attended a J.P. Morgan conference, at which Scangos made the following false and misleading statements regarding Tecfidera's ability to drive business:

> *2014 was a really good year for Biogen . . . and we believe that this can be sustained going into the future. Our core business based on our existing suite of products is robust.  Products continue to do well.*
>
> . . . .
>
> *We believe that [Tecfidera]will continue to be a major business driver* as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world.

195.   Scangos's statements that (1) Biogen's performance in 2014 "can be sustained going into the future"; (2) the Company's "core business based on our existing suite of products is robust"; and (3) "Tecfidera will continue to be a major business driver" were materially false and misleading because of the immediate and significant impact the PML death had on Tecfidera sales in late 2014 and into 2015.  *See ¶¶ 88-130.*  These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See ¶¶ 63-74.*  In addition, the statements that Tecfidera's core business was "robust" and that Tecfidera would "continue to be a major business driver" also were materially false and misleading because, at a minimum for the second quarter of 2015,

Biogen lowered sales goals across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures.  *See* ¶¶ 131-40.

196.    A January 12, 2015 J.P. Morgan report summarized Scangos's positive statements:

> Overall, the tone of CEO George Scangos' presentation – to a packed house – was positive as he reviewed the company's core commercial business (currently capturing ~38% of the MS market). . . .

**G.      January 29, 2015 4Q 2014 Biogen Inc. Earnings Call**

197.    On January 29, 2015, Biogen held a conference call to discuss its 4Q 2014 results that was attended by Scangos, Clancy, and Kingsley.  During the January 29, 2015 earnings call, Scangos made the following materially false and misleading statements regarding Tecfidera's growth:

> [W]e believe that ***[Tecfidera]will continue to grow in the US*** and will grow substantially in international markets, so that ***we anticipate that 2015 will be another year of meaningful growth for [Tecfidera]*** and for our portfolio of MS products, in general.

198.    Scangos's statements that "Tecfidera will continue to grow in the US and will grow substantially in international markets" such that he expected "2015 will be another year of meaningful growth for Tecfidera" were materially false and misleading because Tecfidera sales had declined in almost every region by the end of 2014 and into 2015, leading the Company to lower Tecfidera sales goals by January 2015.  *See* ¶¶ 88-130.  These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See* ¶¶ 63-74.  In addition, these statements were

materially false and misleading because, at a minimum for the second quarter of 2015, Biogen

had lowered sales goals across "all territories and regions" as a result of the "residual impact of

the safety event" announced in October 2014 as well as competitive pressures. *See* ¶¶ 131-40.

199.    On the same conference call, Kingsley also made the following materially false

and misleading statements about Tecfidera's financial performance:

> We believe TECFIDERA is **on track to become the most prescribed therapy for
> MS worldwide**.  In the U.S., we saw continued growth through the fourth quarter,
> with its market share near 20%.  **As you may have seen through IMS, we
> observed moderating new starts for TECFIDERA in the fourth quarter.  We
> believe several factors have impacted the recent performance of TECFIDERA,
> including a decline in the overall market switch rate, the U.S. label update in
> December, and the recent launch of PLEGRIDY, which is capturing some
> interferon switches that otherwise may have gone to TECFIDERA**.

200.    In response to a question from an analyst, Kingsley made additional materially

false and misleading statements of known fact about Tecfidera's financial performance:

**Yaron Werber - Citigroup - Analyst**

[Y]ou mentioned there are three different reasons TECFIDERA was weaker.  It
was weaker or slowing down in terms of new patient adds.  And it was a decline
in switching, U.S. label change, and the PLEGRIDY launch.  Of the three, which
one was the most important?  Thank you.

. . . .

**Tony Kingsley  - Biogen Idec Inc - EVP, Global Commercial Operations**

[O]n TECFIDERA, look, actually hard to piece apart.  Probably, as Paul said, *we
expect the product to grow, but we would see some moderation in growth next
year*.  I think we would have said that in any case for the first reason, which is the
switch rate in the market in the U.S. has come down over the last three or four
quarters.  We've talked about that, I think again, pretty consistently.  When
TECFIDERA launched in the U.S., and we're seeing this repeat outside the U.S.,
it doubled or tripled the switch rate for a period of time. And that's been working
its way down over time.

201.    Kingsley's statements that Biogen "observed moderating new starts for

TECFIDERA in the fourth quarter" and that Tecfidera "would see some moderation in growth

next year" were materially false and misleading because Kingsley knew that Tecfidera sales were down in almost every region in the United States and that doctors were actively discontinuing patients off of Tecfidera across the country because of safety concerns. *See* ¶¶ 63-74, 88-130. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' confidence in Tecfidera. *See* ¶¶ 238, 240. These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug. *See* ¶¶ 63-74.

202. On the same call, Kingsley made the following materially false and misleading statements regarding Tecfidera discontinuation rates following the PML incident:

> ***Importantly, we have not noticed a meaningful change in [Tecfidera]discontinuation rates***. We are actively engaging physicians to ensure proper education on the label update. ***And we believe in the continued growth potential of the product in the US***.

203. Kingsley's statements that Defendants "have not noticed a meaningful change in Tecfidera discontinuation rates" and that they "believe in the continued growth potential of the product in the U.S." were materially false and misleading because Kingsley knew that Tecfidera sales were down in almost every region in the United States and doctors were actively discontinuing patients off the drug because of safety concerns. *See* ¶¶ 88-130. Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' confidence in Tecfidera. *See* ¶¶ 238, 240. These statements also were materially false and misleading because, consistent with what ABMs from

around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug. *See* ¶¶ 63-74, 88-130. In addition, the statement that Biogen believed in the continued growth potential of Tecfidera was materially false and misleading for the additional reason that, at a minimum for the second quarter of 2015, Biogen had lowered sales goals across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures. *See* ¶¶ 131-40.

204.    On the same earnings call, Clancy made the following false and misleading statements regarding Tecfidera performance:

> ***We expect revenue growth between 14% and 16% . . . . Our plan assumes [Tecfidera] will represent the largest contributor to our overall revenue growth***.

205.    Clancy's statements that Biogen expected "revenue growth between 14% and 16%" with "Tecfidera . . . represent[ing] the largest contributor to our overall revenue growth" were materially false and misleading because by late 2014, Tecfidera sales had steeply declined in almost every region in the United States and doctors were actively discontinuing patients off the drug because of safety concerns. *See* ¶¶ 63-74, 88-130. This statement was also materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug. *See* ¶¶ 63-74. In addition, Clancy's statement that revenue would grow between 14-16% was materially false and misleading for the additional

reason that, at a minimum the second quarter of 2015, Biogen had lowered sales goals for its leading drug by that same percentage—15%—across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures. *See* ¶¶ 131-40.

206.    On the same call, in direct response to analyst questions, Clancy and Kingsley made the following materially false and misleading statements regarding Tecfidera performance and discontinuation rates:

**Paul Clancy - Biogen Idec Inc - CFO**

*We think this is still a very meaningful growth with [Tecfidera] that's embedded in the guidance for this year.*

. . . .

**Brian Abrahams - Wells Fargo Securities, LLC - Analyst**

[I]nterestingly, you're not seeing any increase in discontinuations . . . what are you seeing, in terms of physician reactions to the PML case that might be slowing uptake, and what sorts of educational initiatives do you think will be needed to help physicians work around this?

**Tony Kingsley - Biogen Idec Inc - EVP, Global Commercial Operations**

*So we think we have the right education in place.  We have to keep executing it, making sure that things continue to happen.*

*[T]he lack of any meaningful change that we see – or we believe we're seeing – in the discon[tinuation] rate is encouraging, because it doesn't suggest there's such a change in the profile that people are anxious to pull patients out, but on the contrary.*

207.    Kingsley's statements that the Company was "executing" on its educational initiatives with physicians in light of the PML death, and there was no change in the profile of Tecfidera that was causing physicians to pull patients off the drug, were materially false and misleading because Defendants knew that Tecfidera sales were down in almost every region in the United States and doctors were actively discontinuing patients off the drug.  *See* ¶¶ 88-130.

Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera.  *See* ¶¶ 238, 240. These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See* ¶¶ 63-74.  In addition, these statements were materially false and misleading for the additional reason that, at a minimum for the second quarter of 2015, Biogen lowered sales goals across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures.  *See* ¶¶ 131-40.

208.    Clancy's statement that there was "still a very meaningful growth with Tecfidera that's embedded in the guidance for this year" was materially false and misleading because he failed to disclose that by late 2014 and into 2015 sales were down in almost every region in the United States and doctors were actively discontinuing patients off the drug because of its safety profile.  *See* ¶¶ 88-130.  These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug, *see* ¶¶ 63-74, and Biogen lowered sales goals for, at a minimum the second quarter of 2015, "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures, *see* ¶¶ 131-40.

209.    Biogen's common stock price increased by $2.07 per share (0.59%) on January 29, 2015, and by $35.91 (10.17%) on January 30, 2015.

210.    Analysts reacted positively to the Company's message that Tecfidera sales were on target, with no material impact on sales from the PML death.  Deutsche Bank issued a report on January 29, 2015 stating:

> Tecfidera 4Q revenues at $916M were higher than consensus at $879M.  This removes a big overhang on the stock as investors were worried about the performance of the base business.  In our opinion, in-line revenue guidance with higher-than-consensus EPS guidance sets the company up well for 2015.

211.    On January 29, 2015, a J.P. Morgan analyst reported that the Tecfidera "discontinuation rate has been stable."

212.    A January 29, 2015 PiperJaffray report stated that "BIIB posted strong 4Q numbers . . . and provided robust 2015 guidance, confidence in the growth outlook for Tecfidera and its franchise overall."

213.    A January 29, 2015 report from William Blair & Co. stated:

> Fourth-quarter operating performance was driven by better-than-expected sales of Tecfidera, which we highlight, given investor concerns following the report of a PML-related death late last year.

214.    A January 29, 2015 Barclay's report stated that "[i]mportantly, Biogen indicated no change in the discontinuation rate."

215.    A January 30, 2015 Deutsche Bank report observed that "[s]trong Tecfidera sales" drove revenues in closing out 2014, and the 2015 "[n]et revenue growth is again driven by Tecfidera sales," noting that Biogen's management "commented that Tecfidera will represent a large contributor to overall growth."

216.    Guggenheim Securities stated on January 30, 2015 that "BIIB's '15 guidance implies continued strong Tecfidera growth, driving the stock sharply higher . . . . Tecfidera

continues strong.   We believe Tecfidera is quickly becoming the front-line MS treatment of choice, and we expect upside to ''15 sales est[imates].''

### H.    February 25, 201 RBC Healthcare Conference

217.    On February 25, 2015, Kingsley attended a healthcare conference hosted by RBC. Kingsley made the following materially false and misleading statements regarding Tecfidera's safety profile and discontinuation rates:

**Michael Yee - RBC Capital Markets - Analyst**

So maybe talk a little bit about what you are seeing with Tecfidera since 2014 and how we should be thinking about Tecfidera for 2015.

**Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**

*[W]e think Tecfidera is a terrific product that is going to perform very well in the market* . . . . It's got a good profile.  We have positioned it as a great first-line therapy and a great switch-to therapy and that's where the source of our business comes.  *We've talked in the past we are getting about a third of new starts, which is a very good thing and we're getting a nice portion of the switch pool as well*.

. . . .

Fourth quarter, we had the report of one PML incident and I think we talked about this at the earnings call and toward the end of the year, which is that is a meaningful event that you have to manage through.   There's a lot of communication that has to happen to physicians.  *You would expect to see some hesitancy among some set of physicians before you get them to have a conversation about that, but the product has been quite resilient I think is our view in light of that.  In 2015, we think it is still a meaningful growth driver*.

. . . .

**Michael Yee - RBC Capital Markets - Analyst**

So in the fourth quarter, and this is important because we are thinking about Q1, do you think a lot of the PML noise or news has gotten out there and have you started to see a reacceleration of things when you go out into the – what's the feedback from the salesforce?

**Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**

*[I] think the most positive message I would say on Tecfidera is if you are still capturing a third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety. We have not seen any change in the discontinuation rate . . . . You would obviously get very concerned if you saw a spike in the discontinuation rate, no evidence of that.*

**Michael Yee - RBC Capital Markets - Analyst**

Do you think it is stable?  Do you think discontinuation has been very stable?

**Tony Kingsley - Biogen Idec Inc. - EVP, Global Commercial Operations**

*It has been consistent with – we look at it relative to the growth of [product goods].  There is nothing to signal this is not consistent with historical averages.*

218.    Kingsley's statements that (1) Tecfidera was "going to perform very well in the market"; (2) "capturing a third of new starts that makes a pretty strong statement about what the market's perception of the product is, including safety"; (3) the Company was not seeing hesitancy among physicians in light of Tecfidera being "resilient" and that "it is still a meaningful growth driver"; and (4) there was "nothing to signal" that Tecfidera's discontinuation rate was "not consistent with historical averages" were materially false and misleading because by late 2014 and into 2015, sales had declined in most regions and doctors were actively discontinuing patients off of Tecfidera.  *See* ¶¶ 88-130.  Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera.  *See* ¶¶ 238, 240.  These statements also were materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See* ¶¶ 63-74.  In addition, these statements were materially false

and misleading for the additional reason that, at a minimum for the second quarter of 2015, Biogen lowered sales goals across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures.  *See* ¶¶ 131-40.

219.    In a note published on the evening of February 25, 2015, Michael Yee of RBC Capital Markets stated:

> Regarding potential slowdown in Tecfidera, the company remains comfortable with the meaningful one-third share that the drug continues to capture within the new start pool . . . . Believe the product has been quite resilient following the one PML case and the discontinuation rates remain consistent.

### I.    April 24, 2015 1Q 2015 Biogen Inc. Earnings Call and Partial Disclosure of the Truth

220.    On April 24, 2015, Biogen held an earnings call to discuss its 1Q 2015 results. Scangos, Clancy, and Kingsley participated in the call.  During this earnings call, Defendants partially disclosed the truth regarding the PML incident's negative impact on Tecfidera sales.  In addition to reporting Tecfidera revenue of $648 million for 1Q 2015 in the U.S., which was below consensus estimates in the market, Kingsley disclosed an increased hesitancy among patients regarding Tecfidera:  "We just spent much of this week in talking to physicians and understanding what their perspective is . . . what they are seeing is more hesitancy among patients . . . . [T]hey see some hesitance in the conversations that they are having with patients."

221.    In response to the partial disclosure of the truth regarding patient and physician reaction following the PML death, and lower than expected Tecfidera revenue, Biogen's common stock price dropped $28.57 per share (approximately 6%) on April 24, 2015.

222.    However, Defendants continued to mislead the market regarding the true extent of the PML death's impact on Tecfidera sales.  Scangos, Clancy, and Kingsley made the following materially false and misleading statements on the 1Q 2015 earnings call regarding Tecfidera's

performance, while failing to update or correct earlier-issued FY 2015 guidance (and thus confirming it):

### Tony Kingsley - Biogen Inc. - EVP, Global Commercial Operations

. . .[Tecfidera] continued to add patients this quarter, but at an overall slower rate. *In the US, our internal market research suggests that physician intent to prescribe may be improving*.  We believe these data indicate that *we are assisting physicians in putting the updated label into context . . . . We continue to believe that [Tecfidera] remains the preferred oral option in the market, given its strong efficacy, convenience and safety profile*.

. . . .

### Paul Clancy – Biogen Inc - CFO

*[W]e won't be updating our formal guidance this quarter . . . we continue to expect [Tecfidera] will represent the largest contributor to our overall revenue growth*.  If the US trajectory does not improve, we may come in at the lower end of our previously provided revenue growth.

. . . .

### George Scangos – Biogen Inc – CEO

Obviously, a top priority for us is the growth of our entire MS portfolio, including [Tecfidera].  We believe that [Tecfidera] is a compelling treatment option for MS patients, and *our long-term outlook for [Tecfidera], and for our entire MS portfolio, remains strong*.

### Doug Williams - Biogen Inc. - EVP of Research & Development

*[T]here's no real change in the benefit/risk profile of the drug [Tecfidera] for patients with MS.  So it's pretty much status quo at the moment*.

223.    In an effort to blunt the partial corrective information, Kingsley's statement that "physician intent to prescribe may be improving" was materially false and misleading because Tecfidera sales continued to be significantly lower following the PML death and doctors had actively discontinued patients off the drug because of safety concerns.  *See* ¶¶ 88-130.   In addition, Kingsley's statement that "our internal market research suggests that physician intent to prescribe may be improving" was materially false and misleading because, as Defendants

admitted after the Class Period, Biogen's market research indicated a moderation in physician intent to prescribe.  Kingsley's statement that "physician intent to prescribe may be improving" was also materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug, *see* ¶¶ 63-74, and Biogen had lowered sales goals across "all territories and regions" for at least the second quarter of 2015 as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures, *see* ¶¶ 131-40.

224.   Clancy's statement that "we won't be updating our formal guidance this quarter . . . we continue to expect [Tecfidera] will represent the largest contributor to our overall revenue growth" was materially false and misleading because the 14-16% metric was no longer achievable based on Tecfidera sales trends as of March 2015.  *See* ¶¶ 88-130.  This statement was also materially false and misleading because Biogen had lowered the sales goals for the second quarter of 2015 by 15% across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures.  *See* ¶¶ 131-40.

225.   Scangos's statement that "our long-term outlook for Tecfidera . . . remains strong" was materially false and misleading because Tecfidera's trajectory had changed immediately following the announcement of the PML death, and sales continued to be down across the United States, forcing the Company to lower salesperson compensation thresholds.  *See* ¶¶ 88-130, 131-40.   This statement was also materially false and misleading because,

consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug, *see* ¶¶ 63-74, and Biogen had lowered sales goals for the second quarter of 2015 across "all territories and regions" as a result of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures, *see* ¶¶ 131-40.

226.    Similarly, Williams's statement that "there's no real change in the benefit/risk profile in [Tecfidera]" was materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See* ¶¶ 63-74.   In addition, Biogen was aware that Dr. Zamvil had concluded his own study in February 2015 that showed that Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.  *See* ¶¶ 69-74.

**J.    May 6, 2015 Deutsche Bank Health Care Conference**

227.    On May 6, 2015, Clancy attended a healthcare conference hosted by Deutsche Bank.   During the conference, Clancy made the following materially false and misleading statements:

**Paul Clancy - Biogen Inc. - CFO**

***But we fundamentally believe that we got, we still have upward trajectory on [Tecfidera] from a share perspective, from a patient perspective***, no doubt about it.

228.   Clancy's statement that "we fundamentally believe that we got, we still have upward trajectory on Tecfidera" was materially false and misleading because he knew that the current trajectory of Tecfidera in the United States had changed immediately after the PML death, and that it still had not recovered at the time this materially false and misleading statement was made.  *See* ¶¶ 88-130.  The statement was also materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug.  *See* ¶¶ 63-74.  Moreover, Biogen had lowered sales goals for the second quarter of 2015 across "all territories and regions" because of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures.  *See* ¶¶ 131-40.  In addition, Biogen was aware that Dr. Zamvil had completed his own study in February 2015 that showed that Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.  *See* ¶¶ 69-74.

### K.   May 13, 2015 Bank of America Merrill Lynch Healthcare Conference Call

229.   On May 13, 2015, Doug Williams, Biogen's Executive Vice President of Research & Development, attended a Bank of America Merrill Lynch conference.  Williams, speaking on behalf of the Company, made the following materially false and misleading statements regarding Tecfidera's performance:

**Doug Williams - Biogen Inc. - EVP of Research & Development**

***We've done some survey work recently that would suggest that physicians have kind of digested the information [regarding the PML incident], taken it on board and their perspective about the safety profile of the drug has kind of***

***gotten back to where it was before the PML event***.  That's sort of the first step in being able to get back on that trajectory of putting new patients on the drug.

. . . .

***I don't think that those singular cases change the benefit risk profile for the drug in any way.  That's really what we have been communicating to physicians.  I think over time, they have taken that on board and we started to see that in their perception of the drug***.

230.   Williams's statement that physicians had "digested the information, taken it on board and their perspective about the safety profile of the drug has kind of gotten back to where it was before the PML event" was materially false and misleading because Defendants failed to disclose that sales of Tecfidera across the United States had not recovered to the same level as prior to the PML death.  *See* ¶¶ 88-130.   Kingsley also admitted after the Class Period that Defendants knew the PML death had led to a significant change to the safety profile and physicians' view of Tecfidera.  *See* ¶¶ 238, 240.  Williams's statement was also materially false and misleading because, consistent with what ABMs from around the country confirm was the case in other regions, Biogen was aware at a minimum that two very large medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, were no longer prescribing Tecfidera and were discontinuing patients off the drug because physicians had lost confidence in the safety profile of the drug, *see* ¶¶ 63-74, and Biogen had lowered sales goals for the second quarter of 2015 across "all territories and regions" because of the "residual impact of the safety event" announced in October 2014 as well as competitive pressures, *see* ¶¶ 131-40.  In addition, Biogen was aware that Dr. Zamvil had completed his own study in February 2015 that showed that Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.  *See* ¶¶ 69-74.

### L.     May 27, 2015 Sanford C. Bernstein Strategic Decisions Conference

231.    On May 27, 2015, Clancy attended a Sanford C. Bernstein conference.  During the conference, Clancy made the following materially false and misleading statements regarding Tecfidera performance:

**Paul Clancy - Biogen Inc. - EVP & CFO**

[T]here was a safety event late last year *where physician perceptions on the safety profile declined a little bit*, still in a very good competitive profile vis-a-vis other therapies in the marketplace.  *Those have stabilized, right*.

. . . .

*We continue to see our share of capturing of new scripts and switched scripts higher than our share.  That's usually an indication that we'll get upward momentum in the business ... we'd be surprised if we don't see forward momentum from here*.

232.    Clancy's statements that physician perceptions of Tecfidera's safety profile had "stabilized" and that "we'll get upward momentum in the business," such that "we'd be surprised if we don't see forward momentum from here" were materially false and misleading because he failed to disclose that Tecfidera sales had significantly declined since late 2014.  *See* ¶¶ 88-130. Defendants also admitted after the Class Period that physician views of Tecfidera had not yet recovered.  *See, e.g.*, ¶¶ 238, 240.  In addition, Biogen was aware that Dr. Zamvil had completed his own study in February 2015 that showed that Tecfidera significantly lowered patients' lymphocyte counts, damaging their immune systems and leaving them susceptible to PML.  *See* ¶¶ 69-74.

233.    On May 27, 2015, Biogen's common stock closed up $10.04 per share, an increase of more than 2.5%.

## VII.   THE WHOLE TRUTH IS REVEALED

234.   On July 24, 2015, Biogen held an earnings call to discuss its 2Q 2015 results. Prior to the call, the Company filed a Form 8-K in which the Company drastically cut *in half* expected growth in 2015, attributing the change to the sales performance of Tecfidera.   In its Form 8-K, the Company stated:

> Revenue growth is expected to be approximately 6% to 8% compared to 2014, a decrease from prior guidance based largely on revised expectations for the growth of [Tecfidera].

235.   In a Form 10-Q filed the same day, the Company stated that "[d]uring 2015, [Tecfidera]'s U.S. patient growth versus prior quarters has moderated primarily due to changing physician prescribing patterns and intense competition."

236.   On the July 24, 2015 earnings call, Defendants disclosed the actual impact of the PML death and the changed safety profile on Tecfidera:

**George Scangos – Biogen Idec Inc. – CEO**

We had expected to see a reacceleration of Tecfidera this quarter, but that did not happen to any appreciable extent.

. . . .

**Tony Kingsley - Biogen Idec Inc. - EVP of Global Commercial Operations**

We believe the safety event reported in late 2014 has created greater caution on the part of both physicians and patients about switching to orals.   Our US market research indicates a moderation in physician intent to prescribe, though in Q2, Tecfidera continued to gain patients in the US.

. . . .

**Paul Clancy - Biogen Idec Inc. - CFO**

Let me turn to our updated full year 2015 guidance.   We now expect revenue growth between 6% and 8%.   This substantial decrease from our prior guidance is primarily driven by a change in our estimate for Tecfidera's trajectory.   Our balance of year forecast assumes limited patient growth for Tecfidera in the United States.

237.    The market reacted negatively.  Appearing on CNBC prior to the market opening on July 24, 2015, Jim Cramer stated that Biogen's announcement was "a horrendous guide down" from the previous "guidance for their MS drug Tecfidera" and that Biogen's disclosure was "shattering" and "gaffes to the people who have loved this stock."

238.    Analysts on Biogen's earnings call questioned management's abrupt about-face on Tecfidera.  Kingsley admitted in response to an analyst's question that the October 22, 2014 announcement was a "*significant change statement for the profile of Tecfidera, given its very pristine safety profile at the time.*"

239.    Speaking on behalf of the Company, Doug Williams conceded that Biogen saw "*a modest but not trivial increase in discontinuations in Tec[fidera] in the United States.*"

240.    Similarly, Kingsley admitted on July 24, 2015 that "*doctors seemed to get more cautious about moving patients to oral drugs after the FDA last fall required a label change* for the rare brain infection progressive multifocal leukoencephalopathy or PML."[9]

241.    In response to the July 24, 2015 disclosures, Biogen's common stock price plummeted over 20% in a single day on unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,629,730 shares. The share price dropped $85.02 per share, from $385.05 to $300.03, with a corresponding market cap loss of approximately $20 billion.

242.    A July 24, 2015 Piper Jaffray analyst reported that it was "a lackluster 2Q as slowing MS franchise performance including Tecfidera (which is supposed to be the strongest growth driver for this growth company) led to a big revenue miss and downward revision to

---

[9] Eric Palmer, *Biogen Gets Beaten Up as Slowing Tecfidera Sales Lead it to Trim Forecast*, FiercePharma, July 24, 2015, http://www.fiercepharma.com/financials/biogen-gets-beaten-up-as-slowing-tecfidera-sales-lead-it-to-trim-forecast.

guidance . . . . The miss on revenue and lowered 2015 guidance is problematic for a growth company. . . ."

243.    A July 24, 2015 J.P. Morgan report stated that Biogen's "2Q report is a messy one to say the least, with a top-line miss . . . , a pretty significant guidance cut . . . . Sales for Tecfidera were the key driver of the rev[enue] miss." The report further stated that:

> For Tecfidera, what was thought to be a one-time blip in 1Q now clearly appears to be much more systemic; we are lowering our 2020 Tec estimate by ~$2B or 30%. Mgmt pointed to . . . greater caution in prescribing driven by the PML case/label update (leading to a moderation in doctor intent to prescribe). The co[mpany] also noted that discontinuation rates in the US are higher than expected . . . .

244.    A July 27, 2015 J.P. Morgan report questioned management's credibility: "management credibility is clearly tarnished, and there's little doubt that the company is now stuck in the penalty box . . . . The messy 1Q report was supposed to be a one-time anomaly. Instead, 2Q results and revised guidance seem to indicate the problem is much more systemic. It's no wonder that investor confidence is shaken."

245.    A July 27, 2015 Morgan Stanley report stated that "[Management] has a credibility issue with its seeming inability to stem the now sig[nificant] decline in base business performance."

246.    Speaking on behalf of the Company after the Class Period, on September 3, 2015, Clancy acknowledged that Biogen had in fact taken "a safety hit" following the announcement of the PML death with respect to doctors' perceptions of Tecfidera's safety profile.

247.    Due in large part to the poor performance of Tecfidera during the Class Period, Scangos's total compensation package declined by about $2 million.[10]

---

[10] Tracy Staton, *Biogen CEO Sees Bonus Pay Drop on MS, Hemophilia Trouble*, FiercePharma, Apr. 20, 2016, http://www.fiercepharma.com/pharma/biogen-ceo-sees-bonus-pay-drop-on-ms-hemophilia-trouble.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

248.   Numerous allegations, as set forth above and summarized below, give rise to the strong inference that Defendants knowingly, or at least recklessly, misled investors by making the materially false and misleading statements and omissions described herein.[11]

### A.   That the Individual Defendants Made Numerous Specific Statements Regarding Tecfidera Sales Is Directly Relevant to the Scienter Analysis

249.   The Individual Defendants made numerous specific statements regarding Tecfidera's sales, and discontinuation rates, as well as its safety profile.   For example, on January 29, 2015, Kingsley stated during an earnings call:   "Importantly, we have not noticed a meaningful change in [Tecfidera] discontinuation rates."   ¶ 143.   On that same day, Kingsley stated "the lack of any meaningful change that we see – or we believe we're seeing – in the discon[tinuation] rate is encouraging, because it doesn't suggest there's such a change in the profile that people are anxious to pull patients out, but on the contrary."   ¶ 206.   Kingsley further stated during a February 25, 2015 healthcare conference:

> We have not seen any change in the discontinuation rate.   There is a natural discontinuation rate for a product like Tecfidera in terms of tolerability and other things.   You'd obviously get very concerned if you saw a spike in the discontinuation rate.   No evidence of that . . . . [The discontinuation rate] has been consistent with – I mean, we look at it relative to growth of the product.   There's nothing that's a signal that says it's not consistent with historical averages."

¶ 217; *see also* ¶¶ 186, 206.

250.   These particular statements reflect that the Individual Defendants were receiving specific information regarding Tecfidera.   The only other plausible inference that could be drawn

---

[11] Because the Amended Complaint sufficiently pleads a strong inference of scienter as to the Individual Defendants acting within the scope of their positions as Biogen's senior officers, Lead Plaintiff also has pleaded a strong inference of the Company's scienter.   Furthermore, Lead Plaintiff's numerous scienter allegations, viewed collectively, also plead corporate (collective) scienter against the Company.

from these pronouncements is that the Individual Defendants either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to relating to such matters.  In either event, such deliberate recklessness satisfies the scienter requirement.

### B. Tecfidera Sales Were Biogen's Principal Source of Revenue, Triggering a "Core Operations" Inference

251. The Individual Defendants repeatedly emphasized Tecfidera's importance to Biogen, and often referred to the drug as a top priority for the Company.  Furthermore, Tecfidera has been described as Biogen's "blockbuster" drug and "the most prescribed oral MS therapy" worldwide.[12]

252. Tecfidera accounted for 32-34% of Biogen's total revenue in Q4 2014, Q1 2015, and Q2 2015.  During those three quarters, Biogen earned $7,787,280,000 in total revenue.  Of that amount, Tecfidera sales were responsible for $2,624,200,000, or 33.7%.[13]

253. Defendants also emphasized the value of Tecfidera in numerous SEC filings, industry conference appearances, and earnings calls.  For example, on July 23, 2014 during the Q2 2014 earnings call, Scangos referred to Tecfidera as a "major valued contributor" stating that "TECFIDERA continues to gain market share and we believe it's on track to become the leading MS therapy in the U.S.  The early months of our European launch reinforce our belief that TECFIDERA will continue to be a major valued contributor to the company moving forward."

---

[12] Charles Moore, *Biogen's Tecfidera Now the Most Prescribed Oral MS Therapy Globally*, Multiple Sclerosis News Today (July 27, 2014).

[13] *See* Form 8-K (Jan. 29, 2015); Form 10-Q (Apr. 24, 2015); Form 10-Q (July 24, 2015).

254.    Biogen specifically recognized the importance of Tecfidera to the Company's bottom line.  For example, on October 22, 2014 the Company stated in its 2Q 2014 Form 10-Q:

> Our current revenues depend upon continued sales of our principal products, AVONEX, TECFIDERA, TYSABRI, and RITUXAN.  *We may be substantially dependent on sales from our principal products* for many years, *including an increasing reliance on sales of TECFIDERA* as we expand into additional markets.

Similar statements appeared in other Biogen Class Period filings with the SEC, including its Form 10-K filed on February 4, 2015, and its 1Q 2015 Form 10-Q filed on April 24, 2015.

255.    Scangos referred to Tecfidera as a "major business driver" for Biogen during the J.P. Morgan Healthcare Conference on January 12, 2015:

> The products that we launched recently will continue to be major drivers and will play *an increasingly large part in our pipeline* obviously as we go forward.  *We believe that [Tecfidera] will continue to be a major business driver* as it continues to expand in markets where it's already been introduced, and as we introduce it into additional markets around the world.

256.    During Biogen's January 29, 2015 earnings call, Clancy highlighted the Company's dependence on Tecfidera, stating, "Our plan assumes [Tecfidera] will represent the largest contributor to our overall revenue growth."

257.    During the March 2, 2015 Cowen Healthcare Conference, Scangos referred to Tecfidera as "certainly our main driver" in relation to Biogen's market share in the MS treatment segment:

> We are a leader in the treatment of MS, as you all know  there are worldwide about 800,000 patients being treated for MS that is a market of about $17 billion this year.  That market is growing every year in single digits, low single-digit growth every year, and we expect that to continue over the coming years.  Of those 800,000, we treat about 300,000.  And so we treat more patients with more drugs than any other company.  That's – you can do the math.  That's about a 37.5% market share, someone rounded up here.  And we believe it's growing and we'll continue to gain market share and that's the result of the four drugs you see here *TECFIDERA, certainly our main driver here continuing to grow, continuing to do well*.

258.    In view of the foregoing facts – in particular, the fact that Tecfidera was the *most important* source of revenue for the Company during the Class Period – it is appropriate to assume that the Individual Defendants were aware of facts pertaining to, *inter alia*, Tecfidera's safety profile, new starts, and discontinuation rates.   Indeed, to suggest that the most senior executives of a biopharmaceutical company that develops therapies for neurological, autoimmune, and hematologic disorders would be unaware of serious safety concerns relating to the drug that was, by their own description, the "main driver" of the Company's revenue during the Class Period defies logic.

259.    Additionally, Kingsley, as the Company's Executive Vice President of Commercial Operations, would presumably have been aware of the status of Biogen's ongoing monitoring of Tecfidera sales and discontinuations.   In that regard, Kingsley was responsible for overseeing the Company's sales force and commercial operations.   ¶ 41.   And, when the Company announced his departure, Scangos stated that Kingsley had been responsible for the launch and introduction of Tecfidera into the market.   ¶ 164.   As a result of his close proximity to the Company's sales force, Kingsley was aware of, or was reckless in not being aware of, the fact that safety-related concerns had materially impacted Tecfidera sales and caused physicians to stop prescribing Tecfidera and switch patients to other therapies.   ¶¶ 88-130.

### C.    Scienter May Be Inferred from the Fact that Biogen's Product Development and Related Operations Are Highly Regulated

260.    As noted in various SEC filings during the Class Period, Biogen's product development and related operations are highly regulated by both United States government entities and international regulators.

261.    For example, as Biogen explained in its Form 10-K filed with the SEC on

February 4, 2015:

> Our activities, and the activities of our collaborators, distributors and other third
> party providers, are *subject to extensive government regulation and oversight* both
> in the U.S. and in foreign jurisdictions.  The FDA and comparable agencies in
> other jurisdictions *directly regulate many of our most critical business activities*,
> including the conduct of preclinical and clinical studies, product manufacturing,
> advertising and promotion, product distribution, *adverse event reporting and
> product risk management*.
>
> . . . .
>
> Our current and contemplated activities and the products, technologies and
> processes that will result from such activities are *subject to substantial
> government regulation*.

262.    Given the "extensive" and "substantial" nature of the government regulation of

Biogen's key activities, it can readily be inferred that during the Class Period, Defendants closely

monitored the Company's "most critical business activities," including "adverse event reporting"

and "product risk management," as they pertained to Tecfidera.

**D.    The Disparity Between the Individual Defendants' Words and
the Actual State of Affairs Is Indicative of Scienter**

263.    Evidence of the disparity between Defendants' words to the market and the actual

state of affairs within Biogen further supports a strong inference of scienter.  Here, the Individual

Defendants consistently misled investors by reassuring them that there were no significant issues

with Tecfidera's sales.  However, Biogen privately held town hall meetings and acknowledged to

Company employees that the PML death (and its negative impact on Tecfidera sales) was a

"market event."  ¶ 112.

264.    On July 24, 2015 (after the Class Period), a news outlet reported that Kingsley

asserted "*doctors seemed to get more cautious about moving patients* to oral drugs after the FDA

*last fall* required a label change for the rare brain infection [PML]."[14]  This statement is squarely at odds with Kingsley's earlier statement, made *just three months prior* on April 24, 2015, that "our internal market research suggests that physician intent to prescribe may be improving." ¶¶ 152, 222.[15]  Indeed, Kingsley's April 24, 2015 statement was demonstrably false because Biogen had been aware for many months that at least two prominent medical institutions, the Shepherd Center in Atlanta and the University of Pennsylvania, had ceased prescribing Tecfidera and were discontinuing Tecfidera's use in current patients due to a significant change in the safety profile of the drug.  Rather than acknowledge such facts, Defendants doubled down on their misrepresentations, noting as late as May 2015 that "physicians have kind of digested the information [regarding the PML incident], taken it on board and their perspective about the safety profile of the drug has kind of *gotten back to where it was before the PML event*."  ¶ 155. Further, Defendants were aware that Dr. Zamvil and numerous other doctors around the country were actively taking patients off of Tecfidera because of safety concerns about the drug.  ¶¶ 63-74, 88-130.

265.    These patent inconsistencies between Defendants' public pronouncements and what was known internally within Biogen provide further evidence of scienter.

**E.    Post-Class Period Developments Support a Strong Inference of Scienter**

266.    Further contributing to an inference of scienter is the fact Kingsley abruptly left his position at Biogen only two months after the Company's July 2015 admissions concerning Tecfidera.  ¶ 164.  There was no readily apparent replacement for Kingsley at the time he left the

---

[14] Eric Palmer, *Biogen gets beaten up as slowing Tecfidera sales lead it to trim forecast*, FiercePharma (July 24, 2015), http://www.fiercepharma.com/financials/biogen-gets-beaten-up-as-slowing-tecfidera-sales-lead-it-to-trim-forecast.

[15] This temporal proximity further contributes to the inference of scienter.

Company.  On October 9, 2015, Biogen announced in a press release that Kingsley would "leave the company" and that "a search ha[d] been initiated for a permanent replacement."  His sudden departure concerned analysts and was presumed to be in connection with Tecfidera's troubles.[16]

267.    Additionally, on April 20, 2016, it was revealed that Scangos took a substantial pay cut due, in large part, to the performance of Tecfidera during 2015:

> What a difference a year made for Biogen ($BIIB) CEO George Scangos.  *After reaping a $4 million-plus cash bonus for 2014 performance, Scangos collected $1.2 million for 2015.  And the difference lies with Biogen's multiple sclerosis and hemophilia meds.*
>
> . . . .
>
> Biogen didn't disclose those exact goals for competitive reasons.  *But it's clear that a slowdown in sales of Tecfidera, the high-flying MS blockbuster that soared in 2014, as well as slower-than-expected launches in hemophilia played a role.*[17]

Such a dramatic pay cut is not ordinary.  Indeed, the link between the reduction in his pay and the reduction in Tecfidera's sales suggests a clear motive for Scangos to conceal the truth about the drug's safety profile, as his compensation was tied directly to Tecfidera's success in the marketplace.

268.    When viewed collectively, as required by applicable law, Lead Plaintiff's allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.  In either case, Lead Plaintiff adequately pleads scienter.

---

[16] Tracy Staton, *Biogen's Top Commercial Exec Leaves Amid Tecfidera Sales Trouble*, Fierce Pharma (Oct. 12, 2015), http://www.fiercepharma.com/marketing/biogen-s-top-commercial-exec-leaves-amid-tecfidera-sales-trouble.

[17] Tracy Staton, *Biogen CEO Sees Bonus Pay Drop on MS, Hemophilia Trouble*, FiercePharma (Apr. 20, 2016), http://www.fiercepharmaacom/pharma/biogen-ceo-sees-bonus-pay-drop-on-ms-hemophilia-trouble.

## IX.    CLASS ACTION ALLEGATIONS

269.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a Class consisting of all purchasers of Biogen's publicly traded securities during the Class Period from July 23, 2014 through July 23, 2015, inclusive, and who were damaged thereby.   Excluded from the Class are:   (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Biogen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

270.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Biogen had more than 234 million shares of common stock outstanding that traded on the NASDAQ.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Biogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

271.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

272.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

273.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about Biogen's business, in particular the revenue growth and sales prospects for Tecfidera, which was a core component of its business, as well as the Company's operations and management;

(c)    whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

274.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

275.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted

herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

276.    Lead Plaintiff and the Class are entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Tecfidera during the Class Period.

277.    Alternatively, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions under the fraud on the market doctrine because, at all relevant times, the market for Biogen's securities was an efficient market for the following reasons, among others:

(a)    Biogen's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Biogen filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NASDAQ;

(c)    Biogen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Biogen was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including Eric Schmidt, Cristina Ghenoiu, and Anthony B. Rizzuto, Jr. at Cowen and Company; Geoffrey Porges at Sanford C. Bernstein & Co., Inc.; Ian Somaiya and Matthew Luchini at Nomura Asset Management; Chris Raymond at Robert W. Baird & Company, Inc.; Bret Holley, Darren

Gacicia, William Tanner, and Matthew Lillis at Guggenheim Securities, LLC; Matthew Harrison, Matthew S. Pommer, and Amy Le at Morgan Stanley; Michael J. Yee, Adnan Butt, John Chung, and Jeffrey Takimoto at RBC Capital Markets; Brian Abrahams, Matthew J. Andrews, Shin Kang, and Ronald Hsu at Wells Fargo Securities, LLC; Robyn Karnauskas, Mohit Bansal, Evan Seigerman, Alethia Young, and Arjun Mehra at Deutsche Bank; Cory Kasimov, Whitney G. Ijem, Brittany Terner, and Morgan T. Haller at JPMorgan; Ravi Mehrotra, Vamil Divan, Fumiyoshi Sakai, Ronak H. Shah, Koon Ching, Anuj Shah, Jason Kantor, Ari Jahja, and Jeremiah Shepard at Credit Suisse; Joshua E. Schimmer, Jerry Yang, and Steven P. Breazzano at Piper Jaffray; John Sonnier, Matt Phipps, and Andy T. Hsieh at William Blair; Geoffrey Meacham, Michael Ulz, Carter Gould and Jack Meehan at Barclays Capital; Ying Huang at Bank of America Merrill Lynch; Matthew Roden, Jeffrey Hung, Charles Shi, Bradley Canino, and Andrew Peters at UBS Securities; Mark Schoenebaum at Evercore ISI; Terence Flynn at Goldman Sachs; and Jim Birchenough, Chuck Whitesell, Nick Abbott, and Yanan Zhu at BMO Capital Markets; Karen Andersen, Damien Conover, and Julie Stralow at Morningstar; Thomas Wei, Rebecca Forest, Shaunak Deepak, and Timothy Chou at Jefferies; Jeffrey Loo at S&P Capital IQ; Bart Classen at Summer Street Research Partners; Joseph P. Schwartz, Paul Matteis, and Mayank Mamtani at Leerink; Jason N. Butler and Harry Jenq at JMP Securities; Akiva Felt at Oppenheimer & Co.; Yaron Werber at Citigroup; Stephen Willey at Stifel Nicolaus & Co.; David Nierengarten at Wedbush Securities; Joe Pantginis at Roth Capital Partners; Mara Goldstein at Cantor Fitzgerald) at major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

278.    As a result of the foregoing, the market for Biogen's securities promptly digested current information regarding Biogen from all publicly available sources and reflected such information in Biogen's stock price.   Under these circumstances, all purchasers of Biogen's securities during the Class Period suffered similar injury through their purchase of Biogen's securities at artificially inflated prices and a presumption of reliance applies.

## XI.    NO SAFE HARBOR

279.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements or omissions pleaded in this Amended Complaint.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Further, most of the identified false and misleading statements and omissions herein are not forward-looking statements, but are statements of current and historic fact regarding Biogen's practices.

280.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward-looking projections, the portion of those statements relating to current fact are not protected by the safe harbor.

281.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biogen who knew that the statement was false when made.

## XII.   LOSS CAUSATION/ECONOMIC LOSS

282.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff's funds and the Class.

283.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Biogen's securities by misrepresenting or failing to disclose that:  (1) Tecfidera sales dropped steeply and deeply immediately after the Company disclosed the first PML death; (2) Tecfidera sales never recovered during the Class Period; and (3) physician confidence in Tecfidera's safety profile eroded significantly after the first PML death and also never recovered during the Class Period.

284.   The truth about Tecfidera's safety and performance was partially disclosed during earnings calls on October 22, 2014 and April 24, 2015. Specifically, on October 22, 2014, Defendants partially disclosed that Tecfidera's safety profile was materially different than what they had represented to the market when they revealed that a patient taking Tecfidera had died of PML.  Simiarly, on April 24, 2015, Defendants partially disclosed that the PML death actually was having an impact on Tecfidera sales, stating that while Tecfidera "continued to add patients," it was "at an overall slower rate."  However, Defendants still misleadingly downplayed the impact of the PML incident on Tecfidera performance. In response to these partial disclosures, Biogen's stock price dropped by approximately 7% and 6%, respectively.

285.   The truth about Tecfidera's performance during the Class Period was fully and finally disclosed in a press release before the market opened on July 24, 2015, and during an earnings call during the morning of July 24, 2015, in which Defendants announced (1) lower than expected revenues due to poor sales and physician perceptions of Tecfidera, which led to (2) reduced guidance.  In response, Biogen's stock price fell more than 20% in a single day on

unusually heavy trading volume, with 16,611,700 shares traded compared with an average daily trading volume over the Class Period of 1,629,730 shares.

### COUNT I:
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5(b)
### Promulgated Thereunder Against All Defendants

286.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

287.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public regarding Biogen's business, operations, management, and the intrinsic value of Biogen's securities; and (ii) cause Lead Plaintiff's funds and other members of the Class to purchase securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

288.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Biogen's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

289.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Biogen's key MS drug Tecfidera, as specified herein.

290.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Biogen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Biogen's business, specifically its MS product Tecfidera, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Biogen's securities during the Class Period.

291.    Each of the Individual Defendants' primary liability arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports, particularly with respect to Tecfidera, Biogen's most important source of revenue during the Class Period; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public

that they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

292.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true condition of Biogen's business, specifically the significant problems Tecfidera faced before and following the announcement of the PML incident, from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

293.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Biogen's securities was artificially inflated during the Class Period.  In ignorance of the fact that market price of Biogen's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff's funds and the other members of the Class acquired Biogen's securities during the Class Period at artificially high prices and were damaged when the

value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

294.    At the time of said misrepresentations and omissions, Lead Plaintiff's funds and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff's funds and the other members of the Class and the marketplace known the truth regarding Biogen's business, specifically the significant problems Tecfidera experienced in the marketplace after the first PML death, which were not disclosed by Defendants, Lead Plaintiff's funds and the other members of the Class would not have purchased or otherwise acquired their Biogen's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

295.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class.

### COUNT II:
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

296.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

297.    The Individual Defendants acted as controlling persons of Biogen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the materially false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the

various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or should have had unlimited access to copies of the Company's reports, press releases, public filings, and other statements regarding Biogen's business, specifically the significant problems Tecfidera experienced in the marketplace before and after the first PML death, prior to and/or shortly after those statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

298. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

299. As set forth above, Biogen violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Amended Complaint. The Individual Defendants are liable to Lead Plaintiff and the other members of the Class pursuant to Section 20(a) of the Exchange Act as control persons of Biogen, the primary violator.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory out of pocket damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.


Dated: April 27, 2017                    **MOTLEY RICE LLC**

By:  */s/ Gregg S. Levin*
      Gregg S. Levin (BBO # 563771)
      Christopher F. Moriarty (*pro hac vice* pending)
      28 Bridgeside Boulevard
      Mt. Pleasant, SC  29464
      Telephone:  (843) 216-9000
      Facsimile:  (843) 216-9450
      Email:       glevin@motleyrice.com
                 cmoriarty@motleyrice.com

      William H. Narwold (*pro hac vice*)
      One Corporate Center
      20 Church Street, 17th Floor
      Hartford, CT  06103
      Telephone:  (860) 882-1676
      Facsimile:  (860) 882-1682
      E-mail:       bnarwold@motleyrice.com

      *Lead Counsel for Plaintiffs*
      *Metzler Asset Management GmbH,*
      *Erste-Sparinvest Kapitalanlagegesellschaft mbH,*
      *and the Proposed Class*

      **ROBBINS GELLER RUDMAN & DOWD LLP**
      Samuel H. Rudman (*pro hac vice*)
      58 South Service Road, Suite 200
      Melville, NY  11747
      Telephone:  (631) 367-7100
      Facsimile:  (631) 367-1173
      Email:       srudman@rgrdlaw.com

**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Email:      jgardner@labaton.com

*Additional Counsel for Plaintiffs*
*Metzler Asset Management GmbH,*
*Erste-Sparinvest Kapitalanlagegesellschaft mbH,*
*and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Gregg S. Levin, certify that on this 27th day of April, 2017, I electronically filed this

Amended Class Action Complaint with the Clerk of the U.S. District Court using the CM/ECF

system which will be sent electronically to all counsel of record.

*/s/ Gregg S. Levin*_____
Gregg S. Levin